THE PEOPLE *ex rel.* Almon W. Bulkley

*v.*

MOSES SALOMON.

*Opinion filed February 19, 1900—Rehearing denied April 6, 1900.*

1. ATTORNEYS AT LAW—*what such misconduct by attorney as is cause for disbarment.* An attorney acting for an administrator, who collects the money due the estate after the administrator has fled and invests it in his own business, defying the orders of the probate court to turn the money over to administrator appointed by it, is guilty of such misconduct in office as authorizes his disbarment.

2. SAME—*that attorney is on bond of absconding administrator does not justify his retaining funds of estate.* That the attorney acting for an administrator to collect is on the latter's bond does not authorize him to collect the money due the estate and invest it in his business after his principal has absconded, and thus put it out of his power to comply with orders to pay over the money.

INFORMATION for disbarment.

This is a proceeding to disbar the respondent, Moses Salomon, for misconduct in his office as an attorney at law of the State of Illinois. The information, briefly stated, charges that Moses Salomon, acting as an attorney for Joseph Salomon, administrator to collect of the estate of George Wincox, deceased, and colluding and conspiring with him and using the said Joseph Salomon for his purposes, has embezzled and converted to his own use and the use of said Joseph Salomon the entire money and property of the estate of said Wincox, consisting of money and securities, aggregating in round numbers $30,000. Upon the information being filed in this court the respondent was ruled to answer, and answered the information. Replication was filed and the cause referred to George W. Miller, master in chancery of the superior court of Cook county, to take proofs and report them to the court, which has been done.

CHARLES S. DENEEN, State's Attorney, (LORIN C. COLLINS, and JOHN T. RICHARDS, of counsel,) for the relator:

WILLIAM H. BARNUM, and ROBINS S. MOTT, for respondent.

Mr. JUSTICE CRAIG delivered the opinion of the court:

The principal question presented by the record is whether the evidence sustains the charge in the information that Moses Salomon, acting as an attorney for Joseph Salomon, administrator to collect of the estate of George Wincox, deceased, and colluding and conspiring with Joseph Salomon and using him for his purposes, has embezzled and converted to his own use and the use of Joseph Salomon the entire estate of Wincox, consisting of money and securities, aggregating $30,000. The answer of respondent admits that "each and every act with which he is charged in the information, so far as truthfully charged, was done and committed by him in his capacity as an attorney at law."

The evidence shows that George Wincox died in the city of Chicago December 10, 1893, leaving an estate consisting of money and securities, as follows: Cash, $2648; note of Katrina Chatroop, secured by real estate, $20,000, with interest coupons attached thereto for $3600; note of Ernest D. Weaver, secured by real estate, $5000, with interest coupons attached for $300,—making a total of $31,548. Previous to his death for a number of years he had a housekeeper,—a woman by the name of Jennie Cameron. From October 24, 1879, he had a box in the Merchants' Safe Deposit Company in the city of Chicago, wherein he kept his securities. From May 2, 1892, to August 20, 1892, the same box stood in the name of George Wincox and Jennie Cameron. On August 20, 1892, Jennie Cameron, by the name of Mrs. Jennie Cameron, transferred to George Wincox and Mrs. Sadie Aplegren all rights and privileges accruing to her under lease No. 1054 to safe No. 1141 in the vaults of the Merchants' Safe Deposit Company, and from that date until the death of Wincox the box stood in the names of George Win-

cox and Sadie Aplegren, and Jennie Cameron rented another and separate box, No. 1106. It was from this box standing in the names of George Wincox and Sadie Aplegren, No. 1141, that the securities in the information mentioned were taken after the death of Wincox. A few days after the transfer of said box, and on the 29th of August, 1892, Wincox executed what he doubtless believed was his last will and testament, bequeathing to Sadie Aplegren and Anna M. Smith, her sister, all his securities in safe No. 1141 of the vaults of the Merchants' Safe Deposit Company, and also whatever money he should have in the Merchants' National Bank of Chicago, and appointed Sadie Aplegren executrix, without bond. The supposed will was in his own handwriting, and was signed by Henry A. Chatroop and Herman Brockmiller as witnesses. Chatroop says he had been acquainted with Wincox about twenty years; that he saw him eight of ten hours previous to his death; that he saw him in the morning and he died in the evening; that he said to witness: "Henry, I have a will in that satchel; if you will hand it to me I will get it." Witness further says: "I got the satchel and he handed me a paper, and I took it and put it in my pocket." The morning after the death of Wincox, Chatroop sent a telegram to Sadie Aplegren, who lived in Philadelphia, Pa., notifying her of the death of Wincox and asking disposition of the body. The following day he sent another telegram, and Mrs. Aplegren's husband came and took the body of Wincox to Philadelphia for burial. On December 27, 1893, Chatroop wrote a letter to Sadie Aplegren, in which he says: "I am sorry to inform you that I was obliged to file the will of George Wincox on account of its being contested. I think you had better come on and look after your interests." On the same day a petition was filed by Moses Salomon in the probate court of Cook county, signed by Jennie Cameron, in which she stated "that George Wincox departed this life leaving a last will and testament,

as petitioner is informed and believes, the validity of which is disputed and denied," and also "left him surviving Jennie Wincox, his widow, your petitioner, his only heir-at-law."

A petition was filed December 27, 1893, by Moses Salomon, and Albert Ellinger was appointed administrator to collect upon giving bond in the sum of $60,000, and, after qualifying as such, the money and securities were turned over to him.   Moses Salomon appears to have represented Ellinger as attorney.   On March 20, 1894, Salomon presented to the probate court of Cook county another petition, signed "Jennie Wincox," similar to the first petition, and presenting the will of George Wincox for probate.   The two witnesses, Henry A. Chatroop and Herman Brockmiller, were produced in court by Moses Salomon.   Brockmiller was an employee of Chatroop. On the testimony of these two witnesses the court refused probate of the will.   On March 26, 1894, this order was vacated, and after another hearing the same order was again entered, that probate was refused "for the reason that the instrument was not signed by witnesses in the presence of and at the request of the testator."   Sadie Aplegren and Anna M. Smith, the sisters of Wincox, prayed an appeal from this order to the circuit court.

On December 1, 1894, Albert Ellinger resigned, and at the request of Moses Salomon his brother, Joseph Salomon, was by consent of all parties appointed administrator *de bonis non* to collect of the estate of George Wincox, and bond was filed in the sum of $60,000, with Moses Salomon and Michael C. McDonald as sureties.   Ellinger thereupon turned over to Joseph Salomon moneys and notes to the amount of $29,857.02.

On April 8, 1896, the will contest was heard in the circuit court and an order was entered affirming the judgment of the probate court.   On the same day a petition was presented by Moses Salomon to the probate court, signed "Mrs. Jennie Wincox," praying letters of adminis-

tration to Joseph Salomon. On the next day a petition was filed in the probate court, April 9, 1896, by Anna M. Smith, asking that letters of administration be granted to the Equitable Trust Company of Chicago, and an order was entered therein that the cause be set for hearing the next day. On April 10 another petition was filed by Moses Salomon, signed "Mrs. Jennie Wincox," asking that letters of administration be granted to herself. On February 5, 1897, an order was entered by consent of all parties, appointing the Equitable Trust Company administrator, but this order was vacated February 11, 1897, and an order was entered on the court's own motion appointing Jesse Holdom administrator, and ordering Joseph Salomon to settle his final account with said estate within ten days from that date. On February 25 the time was extended five days from that date. On March 3 a rule was entered on Joseph Salomon to show cause why he should not be punished for contempt for failing to settle his final account with said estate, and on March 4 an order was entered committing him for contempt. After the order was entered Salomon filed an account in the probate court, in which he charged himself with having received from Ellinger cash and notes to the amount of $29,857.02, from which he claimed allowances of $5030.65, leaving an admitted balance of $24,826.37. Immediately after filing the account, Jesse Holdom, the administrator, made demand upon Joseph Salomon, in the probate court room, for the assets of the estate admitted to be in his possession. Objections were afterwards filed on behalf of Sadie Aplegren and Anna M. Smith to certain of the alleged credits, and these objections were heard January 26, 1898. At that hearing Moses Salomon was called as a witness, and his testimony has been stipulated into and is a part of this record.

After the commitment of Joseph Salomon to jail for contempt on March 4, 1897, he filed a petition for *habeas corpus* in the superior court of Cook county for his re-

lease, which was heard by Judge Goggin but the writ was denied. Another writ was heard in the circuit court by Judge Gibbons, which was also denied. He sued out a writ of error from this court and asked it be made a *supersedeas*, which was also denied. August 4, 1897, a writ of error was sued out of the Appellate Court for the purpose of having the order of March 4, 1897, reviewed, and asking that it be made a *supersedeas*, which was granted, and subsequently the Appellate Court reversed the order of commitment because it was prematurely entered, in that the court should have first ascertained the balance due and ordered its payment within a reasonable time. The court, in its opinion in that case, said: "According to Salomon's own showing, after allowing all his claims of credits he has in his possession, as administrator to collect of said estate, nearly $25,000 of assets which he has no just right to retain." The hearing on the exceptions to the account of Joseph Salomon was had January 26, 1898, and on January 28, 1898, an order was entered requiring Joseph Salomon to pay to Jesse Holdom, administrator, upon demand, the sum of $24,826.37 so appearing by final account of Joseph Salomon to be due from him to the estate, and the further hearing upon the objections was continued until February 9, 1898. On the hearing an order was entered requiring Joseph Salomon, as administrator to collect, to pay to Jesse Holdom, administrator, in addition to the sum found due by the order of January 28, 1898, and ordered thereby to be paid, the further sum of $6192.06.

Joseph Salomon having left the State of Illinois and gone to the city of New York, Jesse Holdom, as administrator, was compelled to go to the State of New York to make demand before suit could be brought on the bond, and, as the evidence shows, Holdom did on the 21st day of March, 1898, at 320 Broadway, New York, demand of Joseph Salomon the sum of $24,826.37 admitted by him

to be due by his account filed in the estate, and which
was ordered paid by the probate court January 28, 1898.
At the time the demand was made by Holdom, Joseph
Salomon also said he could not do anything about it
then, and to see his brother, Moses Salomon. Holdom
testified he saw Moses Salomon the first day of April,
1899, and had an interview with him in his office in the
Roanoke Building, Chicago, and delivered unto him a
written notice, and also read it to him, in which notice
Holdom, as administrator of the estate of George Win-
cox, deceased, demanded of Moses Salomon that he pay
and deliver to him the moneys and property of the estate
which he held as attorney at law at the time representing
Joseph Salomon, administrator *de bonis non* to collect of
said estate, including the money he received from Albert
Ellinger, the former administrator to collect, and the
money collected from the note and interest coupon notes
of Katrina Chatroop, particularly the note of $20,000 re-
ceived by him. Holdom says that after reading the notice
"Moses Salomon smiled at me and virtually made no re-
sponse." Holdom also swears that in response to ques-
tions put to Joseph Salomon by him, Joseph further
stated that the only reason he did not pay said amount,
or any part thereof, was, that he had not the money, and
that the matter must be arranged by Moses Salomon, his
brother and his attorney, with an office in the city of Chi-
cago; that Joseph Salomon was working for the Chicago
Architectural Iron Works, a corporation, of which his
brother, Moses Salomon, one of his sureties, was presi-
dent; that he thought Moses Salomon would arrange for
the payment of a large portion of the amount demanded
of him, Joseph Salomon, in about a year from that time,
provided nothing was done to embarrass him or the busi-
ness of the Chicago Architectural Iron Works, of which
he was president, and out of which he expected to make
sufficient money to pay a large portion of the indebted-
ness due the estate.

On April 7, 1899, an order was entered by the probate court finding that George Wincox died leaving him surviving no widow, but leaving him surviving Anna M. Smith, wife of Edward L. Smith, his sister, and Sadie Aplegren, wife of Oscar Aplegren, his sister, his only heirs-at-law. Both Moses and Joseph Salomon afterwards entered a motion to vacate and set aside that finding, but the motion was overruled, and they prayed an appeal to the circuit court, basing their right to appeal on the allegations that they were creditors of Jennie Wincox and interested in her estate.

The testimony of Moses Salomon himself clearly establishes the charge that he, as attorney, converted to his own use and the use of Joseph Salomon the entire estate of George Wincox. He testifies: "Besides this money that was obtained from Ellinger, ($6800,) and which went into the Chicago Architectural Iron Works, there was $20,000 came in a check from Jacob Rehm to me. Then I received a check from Andrew Leicht for $208 and some cents, interest. That was payable to me also. It is a fact that that $20,000 check was given to H. H. Walker and that he gave me back one for $8000 and one for $10,000, and the remaining $2000 he credited upon a mortgage account which I owed him. The $10,000 was deposited to the credit of the Chicago Architectural Iron Works directly, and the $8000 went into my personal account, and afterwards the $8000 was turned over to the Chicago Architectural Iron Works. I conducted that transaction all the way through.

Q. "That practically then placed the entire moneys of the estate in the hands of the Architectural Iron Works. That is right, isn't it?

A. "You have stated the facts there. That is as they are. No evidence was given of this alleged loan to this estate other than a credit on the books,—no note given, no security given, no provisions for the payment of the interest on it for its use. It was credited on the books

of the Chicago Architectural Iron Works, but it was credited to my personal account.

Q. "So that any one examining the books of that company would not have obtained a suspicion that the estate of George Wincox had any claim against the company, would they?

A. "No, sir. You use the word 'suspicion.' I suspect a great deal."

The check of Jacob Rehm for $20,000, dated Chicago, December 19, 1895, on the Merchants' National Bank, was payable to the order of Moses Salomon, and was endorsed on the back by Moses Salomon to H. H. Walker. The stockholders of the Chicago Architectural Iron Works, Moses Salomon swears, were William E. Salomon, Joseph Salomon, Leo Salomon and himself; that it was only a family affair.

It is impossible to read the evidence in this case without being impressed with the fact that Moses Salomon has resorted to every legal subterfuge and technicality to retain possession of this money belonging to this estate, and has been using it in his business for upwards of three years, defying the orders of the probate court to pay it over to Jesse Holdom, the proper administrator. What defenses does Moses Salomon set up in his answer? One is, that Jesse Holdom was improperly appointed administrator. The order appointing Holdom was not appealed from, nor has it been vacated. As the probate court had jurisdiction to appoint an administrator its judgment is final and conclusive and its validity cannot be questioned in this proceeding.

Another defense attempted to be set up is, that Jennie Wincox was the widow, and therefore she was entitled to the entire estate; that she authorized him to collect the $20,000 Chatroop note and invest the money, and that he invested it in the Chicago Architectural Iron Works. Jennie Wincox was not the widow of deceased, and she had no right or authority to give any directions

in regard to the disposition to be made of the estate. But even if she had been the widow of the deceased, she,. as such, would have had no authority to give the Salomons any direction in regard to investing the money or property in their hands belonging to the estate. Joseph Salomon was appointed an administrator to collect. His powers and duties were defined by the statute. The statute was his guide, and that he was bound to follow, regardless of any directions he may have received from a supposed widow. Section 11 of chapter 3 of the Revised Statutes, entitled "Administration," defines the duty of Joseph Salomon, as such administrator, "to collect and preserve the estate of any such decedent, until probate of his will, or until administration of his estate is granted, * * * and delivering up the same when thereunto required by the court, to the proper executor or administrator, whenever they shall be admitted and qualified as such." By section 12 he was authorized to collect and secure the said property. By the bond required by section 13 he bound himself to "deliver to the person or persons authorized by the probate court, as executors or administrators, to receive the same, all such goods, chattels and personal estate as shall come to his or her possession, as aforesaid." Section 14 required him to take and subscribe an oath before the clerk of the county court to well and honestly discharge the trust reposed in him, as administrator to collect of the estate of the deceased, according to the tenor and effect of the letters granted to him.

From these provisions of the statute it is apparent that Joseph Salomon, as administrator to collect, and Moses Salomon as his attorney, had no authority to invest the estate, or any part of it. They could only collect and preserve the estate and deliver it to such administrator or executor as the probate court might appoint. But in plain disregard of the statute and the duties imposed by law, while Joseph Salomon was the adminis-

trator to collect and to preserve the estate he fled from the State, and Moses Salomon collected the moneys due the estate and converted them to his own use, and is now, as appears from the record, using the money belonging to the estate in his own business. Moses Salomon knew or was bound to know that Jennie Wincox had neither right nor authority to direct the money belonging to the estate invested, in any direction.

Neither does the bond given by Joseph Salomon, with Moses Salomon as one of his sureties, excuse either Joseph or Moses Salomon for investing this money and putting it beyond their power to comply with the order of the probate court to deliver it to Jesse Holdom, the administrator appointed by the court. It was the duty, under the statute, of Joseph Salomon to have the money or the securities ready to turn over to the person or persons authorized by the probate court to receive the same, and Moses Salomon, as an attorney at law and acting as such for his brother, Joseph Salomon, should have done nothing to prevent the order of the court being carried out.

The facts disclosed by the record in this case show the conversion of nearly $30,000 of money and securities belonging to the estate of George Wincox, deceased, by the administrator to collect, and Moses Salomon, his attorney and adviser, and that Moses Salomon is using this money in his business and has been for upwards of three years, and for his own benefit. Such conduct on the part of an attorney at law must be regarded, within the statute, as "malconduct in office," and must be condemned as unworthy of the honorable profession to which he belongs. Sharswood, in his Essay on Professional Ethics, says: "There is no class of men among whom moral delinquency is more marked and disgraceful than among lawyers. Among merchants so many honest men become involved through misfortune that the rogue may hope to take shelter in the crowd and be screened from observation. Not so the lawyer. If he continues to seek busi-

ness he must find his employment in lower and still lower grades, and will soon come to verify and illustrate the remark of Lord Bolingbroke, that 'the profession of the law, in its nature the noblest and most beneficial to mankind, is in its abuse and abasement the most sordid and pernicious.'"

An order will therefore be entered making the rule absolute, striking the name of Moses Salomon from the roll of attorneys and disbarring him from practicing law in any of the courts of this State.

*Rule made absolute.*