(Nos. 37624, 37625.—

*In re* ESTATE OF OSCAR J. BREAULT.—(RICHARD DAHM, Trustee, *et al.,* Appellants, *vs.* FLORENCE B. BREAULT, Guardian, *et al.,* Appellees.)

*Opinion filed Sept. 27, 1963.—Rehearing denied Nov. 25, 1963.*

Jacob Shamberg, Hirsch E. Soble, J. Glenn Shehee, and Richard P. Fredo, all of Chicago, for appellants.

Yowell, Long, Macdonald & Yowell, (John J. Yowell, Robert W. Macdonald, and G. Kent Yowell, of counsel,) for appellees.

Mr. Justice Solfisburg delivered the opinion of the court:

We consider here two separate appeals and a cross-appeal from orders of the probate court of Cook County entered in the matter of the estate of Oscar J. Breault, deceased. A freehold is involved to give us jurisdiction on direct appeal.

Kathryn M. Breault died August 3, 1952, leaving a last will and testament which devised and bequeathed the bulk of a substantial estate to Harold L. Feigenholtz and Richard Dahm, as trustees, for the benefit of her son, Oscar J. Breault, during his lifetime. Dahm, it appears, had been a long-time employee in a business conducted by the testatrix and her deceased husband, while Feigenholtz had become her attorney shortly before the will was executed. The will also bestowed a general testamentary power of appointment over the trust assets in the following manner: "Upon the death of my son, Oscar J. Breault, the property of the trust estate shall be distributed according to the provisions and terms of the Last Will and Testament of my said son, Oscar J. Breault, and if he shall fail to execute a Will or such Will should not be admitted to probate, I hereby direct distribution of said estate in the following manner:" *etc.,* naming three charities which were to share equally.

At the time of her death the testatrix was the owner of all of the 1000 shares of common stock in Brolite Company, Inc., the family business. Feigenholtz and Dahm subsequently became directors and officers of the corporation and, when the estate was closed, title to the stock passed to them as trustees. In the ensuing years income from the trust, including stock dividends, was paid to Oscar periodically and on three occasions in the seven-year period intervening between the mother's death and that of Oscar, the trustees rendered reports and accountings which Oscar apparently approved.

Oscar was married three times, the first two marriages ending in divorce, and, it is to be gathered from the record, in bitter, costly and almost continuous litigation over support. The first wife was Ann and a child of the marriage, Kenneth Breault, is a party here. Two children, William J. and Bonnie Ellen Breault, were born of the second marriage to Florence and the latter, as guardian

of the minor children, is likewise a party to these appeals. Oscar's third wife was Estelle, also a party, and he was married to her when he met an untimely death by drowning on July 16, 1959. The circumstances of his death required an investigation, and on August 5, 1959, as the result of a petition filed by Estelle, wherein it was alleged there would be a delay in the issuance of letters testamentary, Feigenholtz was appointed administrator to collect Oscar's estate and set about to do so.

A will which had been executed by Oscar in November, 1954, after his marriage to Estelle, was admitted to probate on October 14, 1959, at which time Feigenholtz qualified as executor and posted a bond of $200,000. Oscar's will first directed the payment of debts and taxes and then continued in pertinent part: "I give, devise and bequeath all the rest, residue and remainder of my property, of whatsoever character and wheresoever situate, be it real, personal or mixed, belonging to me at the time of my death, *or over which I have the power of disposition*: to Harold L. Feigenholtz, of Chicago, Illinois, and his successor or successors as Trustee for and upon the following Trusts, purposes and conditions, * * *." (Emphasis ours.) Subsequent provisions directed that the income from the trust should be paid to Estelle during her life, and upon her death in equal shares to Oscar's three children until the youngest should reach the age of 40 years, at which time the corpus was to be distributed between the children (5% each) and a charitable institution (85%). At the time of Oscar's death, when his will took effect, the trust estate over which he had been given a power of appointment by his mother's will totalled in excess of $400,000, and included a residence property in Florida which had been purchased with trust funds for Oscar's use.

The principal issue on this appeal is whether, by virtue of the manner in which Oscar's power of appointment was exercised, the appointive property became an asset of and

passed through Oscar's estate. However, a true perspective of this and the remaining issues, and what provoked them, requires a statement in their chronological order of some of the more important happenings after the admission of Oscar's will to probate. The very next day, October 15, 1959, Dahm and Feigenholtz, as trustees under the mother's will, conveyed the Florida real estate to Feigenholtz as executor of Oscar's estate. On October 21, 1959, Dahm and Feigenholtz, as trustees, paid fees of $2,500 each to themselves and their attorney, and paid the $7,400 balance in their trustee's account to Feigenholtz as administrator to collect. Subsequently, the trustees rendered a "Fourth and Final Account" as of October 21, 1959, showing no balance, and Feigenholtz, as administrator to collect, approved the account. Without going into further specific detail, other assets which had belonged to the mother's trust estate, (as well as personal assets of Oscar marshalled by Feigenholtz in his capacity of administrator to collect,) were turned over to Feigenholtz as executor of Oscar's estate. When the turn-over was complete an inventory was filed March 9, 1960, which listed not only Oscar's personal assets but also all of the appointive assets as "property of the decedent," the total value being fixed at $504,447.60. On the same day, the court ordered Feigenholtz to file an additional executor's bond in the sum of $800,000.

In the days that followed, some items of personal property included in the appointive assets were sold by the executor with the court's permission, and by an order entered March 16, 1960, the executor was authorized to sell the Florida real estate at either public or private sale. On April 13, 1960, a $10,000 dividend declared by Brolite was paid to Feigenholtz as the executor of Oscar's estate.

A turning point occurred on July 1, 1960, when the minor children of the second marriage, by their mother, Florence, as next friend and guardian, filed suit in a Federal district court in Illinois to contest their father's will. The

complaint alleged that the execution of the will had been procured by undue influence on the part of Feigenholtz, and Federal jurisdiction was asserted on the ground of diversity of citizenship and that the amount in controversy exceeded $10,000, exclusive of interests and costs.

On July 12, 1960, an amended inventory was filed in Oscar's estate. This inventory distinguished between and listed separately Oscar's personal assets, fixed at $25,805, and the property over which Oscar had a "Power of Appointment or Disposition," the value of which was represented as being $477,568.60. On the same day Feigenholtz and Dahm, as trustees under the mother's will, filed claims of $20,000 and $17,363 against Oscar's estate, the first sum representing money loaned to Oscar in his lifetime for the purchase of a boat and the second sums advanced by the trustees after Oscar's death in payment of certain debts. Thereafter, on August 31, 1960, Feigenholtz, as executor, filed a motion in the Federal court to dismiss the will contest, alleging that Oscar's estate was insolvent and that the jurisdictional requisite of $10,000 was not therefore involved. This motion, we are advised, stands continued and unresolved.

On October 12, 1960, Feigenholtz, as Oscar's executor, reconveyed the Florida real estate to himself and to Dahm as trustees under the mother's will. About the same time Brolite declared a dividend of $35,000 and on this occasion it was paid to Feigenholtz and Dahm as trustees, who reopened their trustee's account by depositing such amount. The same day, October 13, 1960, they issued a check of $18,000 in payment of income tax.

A resolution of the confused state of affairs surrounding the appointive assets was brought to the fore on August 4, 1961, when Florence Breault, as guardian for the two minor children of the second marriage, filed a petition to remove Feigenholtz as executor and for the appointment of an "administrator de bonis non." In substance, the petition

charged Feigenholtz with several failures and omissions, including the failure to file an additional $800,000 bond as ordered by the court; that he had been guilty of false pretenses and misrepresentation in securing letters testamentary; that his consent to the claims filed by the trustees under the mother's will was fraudulent and for the purpose of defeating the jurisdiction of the Federal court over the will contest; that he had failed to inventory the estate's right to an accounting from the trustees under the mother's will, and that, contrary to the provisions of the will of Oscar and his mother, Feigenholtz was claiming that the appointive assets were not a part of Oscar's estate. In regard to the latter charge, the petition advanced the construction that the appointive assets had become a part of Oscar's estate, inasmuch as Oscar's will "treated the property the same as his own and appointed it to his executor and to the trustees of his estate."

Feigenholtz filed an answer to the petition which, in essence, either denied or explained the omissions and failures charged to him, denied all charges of fraud and misrepresentation, and, in defense to the charge that he had not inventoried the appointive assets, advanced the construction that the exercise of the power of appointment in Oscar's will "did not vest title in said trust property in him or his estate."

On November 1, 1961, while hearings on the petition to remove were in progress, Feigenholtz, with leave of court, filed his first executor's account, and a guardian *ad litem,* who filed general objections, was appointed to represent the minors at the hearing on such account. A few days later Feigenholtz filed a motion to vacate the order which had directed him to file an additional bond of $800,000.

The matter of the petition, the account and the motion were consolidated, and, after further hearing, the probate court, on July 2 and 3, 1962, respectively, entered an order

denying the petition for removal, and an order which (1) vacated the prior direction for additional bond, and (2) modified and approved the executor's first account, subject to further objections or argument. In separate memorandum opinions accompanying its orders, the court found, first, that neither fraud, misrepresentation nor any of the statutory grounds for the removal of the executor had been proved or substantiated; second, that "the property over which the decedent exercised his power of appointment in his will * * * passed title to the property from Kathryn Breault directly to the testamentary trustees under the will of Oscar Breault insofar as the proceedings under consideration are concurred;" and third, that Feigenholtz, as executor, was required to account only for the items of property personally owned by Oscar at his death, inasmuch as title to the appointive assets had passed to the testamentary trustee.

As permitted by the court's order the guardian *ad litem* filed additional objections to the executor's first account, while Florence Breault, as guardian, filed a motion to vacate the orders of July 2 and 3, 1962. Upon further consideration of the matter the court entered an order on November 27, 1962, reasserting its denial of the petition for the removal of the executor, but otherwise reversing its former orders in all respects by adjudging and ordering: (1) That all of the assets of the Kathryn Breault trust on the date of Oscar's death became assets of his estate which should be inventoried and accounted for by his executor; (2) that Oscar's executor was entitled to an account of the income and expenditures in the Kathryn Breault trust from the last account approved by Oscar in his lifetime until such time as the trust assets are surrendered to Oscar's executor; (3) that the executor's first account was disapproved and the executor directed to render a true account; (4) that a special administrator should be appointed to represent the

estate for the purposes of receiving and participating in the hearings upon both the trustees' first report and the executor's first account; and (5) that the executor should file a bond of $800,000 with satisfactory sureties. A separate order, entered the following day, appointed a special administrator for the purposes indicated.

By a further memorandum opinion, the court explained its change of position by holding in substance that Oscar's will manifested an intention on his part to appoint the trust assets to his own estate, thus making the appointive property assets of his own estate which necessarily had to be inventoried and accounted for by his executor.

Pursuant to the provisions of section 50(2) of the Civil Practice Act, (Ill. Rev. Stat. 1961, chap. 110, par. 50(2),) the order of the probate court found there was no just reason for delaying appeal and, accordingly, separate appeals have been prosecuted by the trustees under Kathryn Breault's will and by the executor of Oscar's will from all portions of the order of November 27, 1962, except that denying the petition for the removal of the executor, and from the order of November 28, 1962, appointing a special administrator. Florence Breault, as guardian of her minor children, has filed a cross-appeal from the denial of the petition to remove. Estelle Breault and Kenneth Breault have joined in the appeal of the executor, while the guardian *ad litem* representing William J. and Bonnie Ellen Breault has joined in the guardian's cross-appeal.

The trustees and the executor, hereinafter referred to as appellants, attack the order finding that the appointive property became assets of Oscar's estate on a broad front, many of their contentions raising matters completely collateral to the issues presented and decided in the probate court. However, in the view we take, consideration need be given only to their principal contention which treats the power as having been effectively exercised and advances the construc-

tion that Oscar did not appoint to his estate in such a manner as to subject the appointive assets to distribution by his executor.

In considering this problem we may start with firmly established principles of law governing the operation of powers of appointment. Repeated decisions have held that a power of appointment is not property and that the donor does not vest title to the property in the donee of the power, (*Oglesby* v. *Springfield Marine Bank*, 385 Ill. 414; *Botzum* v. *Havana National Bank*, 367 Ill. 539); that the objects of an appointment take from the donor, not the donee of the power, (*People* v. *Kaiser*, 306 Ill. 313); that the property passing pursuant to the exercise of the power passes under the instrument creating the power, just as though the appointment were read into the original instrument, (*Keays* v. *Blinn*, 234 Ill. 121; *Christy* v. *Pulliam*, 17 Ill. 59); and that property subject to the power passes as a part of the estate of the donor of the power. *United States* v. *Field*, 255 U.S. 257, 65 L. ed. 617.

There is, however, a recognized exception to the rule that property subject to the power passes as a part of the estate of the donor of the power. This exception, as it is stated in Carey and Schuyler, Illinois Law of Future Interests, sec. 364, p. 492, is that "property subject to a general power of appointment may pass as a part of the estate of the donee of the power if the donee shows an intention to take such property 'out of the instrument creating the power,' and 'to make it his own for all purposes,' * * *." Again, at p. 493, the authors state: "If, for example, the donee of the power masses the property subject to the power with his own, as by residuary appointment, charges it with the payment of his debts, or refers to the appointable property as his own, *there may be an inference,* that the donee intended to make the property a part of his estate for all purposes, * * *." (Emphasis supplied.) This is the exception relied upon by appellees to support their claim that

the appointive assets must be inventoried and distributed as a part of Oscar's estate. Our problem is whether Oscar's will manifested such an intention, keeping in mind that intention must be ascertained from the entire will and by attributing to the words employed their plain and ordinary meanings. *City of Wood River* v. *Hart,* 23 Ill.2d 119; *Watkins* v. *Nobiling,* 22 Ill.2d 290.

As may be noted from its previous quotation, the third paragraph of Oscar's will was a residual devise and bequest of "my property * * * belonging to me at the time of my death or over which I have a power of disposition," to Feigenholtz, as trustee. The only other provision of the will advanced as having significance is paragraph fourteen which provides:

"Fourteenth: I hereby give my Executor full power and authority, without order of court, to exercise all the powers, duties, discretions, titles and obligations with respect to my Estate, both real and personal, during the period of probate of my Estate, that are granted to or imposed upon the Trustee under Articles Third, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth hereof, as herein set forth in this Will, subject to the same limitations and restrictions therein imposed upon the Trustee as shown in this Will, and my Executor is authorized to distribute the income from my Estate during the period of probate. I hereby give my Executor full power and authority, without order of court, to make payment of the legacies, devises and bequests hereinbefore made and to make distribution of my residuary estate in stocks, securities, or other property, or cash, or any combination of stocks, securities or other property and cash, and in such proportions thereof as my Executor shall determine to be most equitable. For the purpose of making such payment and distribution the stocks, securities or other property shall be distributed at the fair market value thereof, but if my Executor shall be unable to determine such fair market value, then at such value as my Executor shall determine. For the purpose of determining such value or market value, as the case may be, my Executor may rely upon whatever information he may deem pertinent, without any requirement whatsoever. I hereby give my Executor full power and authority to settle and compound any claims, either in favor of or against my Estate, upon such terms as to my Executor shall seem best, and for the purpose aforesaid to execute all proper and necessary conveyances and to give full receipts and discharges. I further hereby give my Execu-

tor full power and authority, without order of court, to retain or to sell and convey any property, whether real or personal, belonging to my estate, as to it shall deem best, subject only to the restrictions aforesaid, and to execute and deliver all proper and necessary conveyances, bills of sale, assignments, and other instruments necessary to effect any such sale. The powers enumerated in this Article Fourteenth are not intended and shall not be construed in any respect as in limitation of any powers conferred upon Executor by law, but are intended and shall be construed as in addition thereto."

While the exception relied upon by the appellees was recognized and applied by this court in *Bradford* v. *Andrew*, 308 Ill. 458, to find that appointive property passed as a part of the donee's estate where there was a lapsed appointment, its application to the setting here appears to be one of first impression. All authorities found, however, indicate that the intention of the donee to appoint to his own estate must be expressly stated or clearly implied, and we strongly concur in such view.

Some jurisdictions imply the intention where the testator masses, blends or merges, (as it is variously called,) his own personal property with the appointed property for all purposes, (viz., payment of debts, taxes, legacies, *etc.*,) and it is the contention of the appellees that this was accomplished here by the third paragraph of Oscar's will. However, we do not find this to be so. The only test we have found for determining whether there has been a blending of the two estates sufficient to imply appointment to the donee's estate is the one stated in the case of *In re Hagen's Estate*, 285 Pa. 326, 132 A. 175, at 176, as follows: "The mere fact that the appointed estate is given to the same persons who take the residue of a testator's individual estate is not the test to be applied in determining whether there has been a blending of the two estates, but the real test under our line of decision is whether the testator has *treated the two estates as one for all purposes*, and manifested an intent to commingle them generally." (Emphasis supplied.) (Also see: *In re Anderson's Estate*, 373 Pa. 294, 95 A. 2d 674, 676.)

Quite obviously, that test cannot be met here, for Oscar, by the first two paragraphs of his will directed the payment of debts and taxes before any attempt at blending or commingling occurred. Under the circumstances there cannot be said to have been the blending *for all purposes* needed to imply the intent to appoint to his own estate. *Cf. In re Valentine's Estate,* 297 Pa. 99, 146 A. 452; *In re McCord's Estate,* 276 Pa. 326, 120 A. 413; *In re Jackson's Estate,* 337 Pa. 561, 12 A. 2d 338.

Other jurisdictions have found the necessary indicia of intent in a direction that the appointive property be paid over to the donee's executor. Indeed, in New York such a specific direction is mandatory, along with merger or blending, before there can be an administration of the appointive property by the donee's executor. (*In re Bray's Will,* 120 N.Y.S. 2d 131; *In re Yznaga's Estate,* 88 N.Y.S. 2d 504.) The appellees, without analysis, argument or citation of authority next contend that such a direction was accomplished by paragraph fourteen of the will. We do not, however, read such a direction into that paragraph. At best it creates an ambiguity in the will, particularly with respect to the appointment made to the trustee in paragraph three, thus permitting us to look into the circumstances surrounding the execution of the will. (*Whitmore* v. *Starks,* 17 Ill.2d 202; *O'Connell* v. *Gaffney,* 23 Ill.2d 611.) The circumstances here show careless draftsmanship rather than a wavering of uncertainty on the part of the testator, for it appears that the fourteenth paragraph was copied verbatim out of the mother's will with no particular attention to the provisions of Oscar's will which preceded it. Moreover, the third paragraph appointed to Feigenholtz, as trustee, in clear and certain terms, and such a direction to a trustee, rather than to his executor, has been held to make manifest that the donee was not considering the estate as his own. (*In re Hagen's Estate,* 285 Pa. 326, 132 A. 175.) Particularly is this true where, as here, the exercise of the power

of appointment by the donee continues the property in trust. *In re Baldwin's Will*, 139 N.Y.S. 2d 413.

Relying heavily upon *Bradford* v. *Andrew*, 308 Ill. 458, the appellees next urge that Oscar's use of the word "my property" in the third paragraph, manifests an intent to claim the appointive property as his own. Even if it be assumed that the words "my property" had grammatical reference to what the testator subsequently referred to as property "over which I have a power of disposition," we are not inclined to imply the required intent from the bare words upon which the appellees rely. In *Bradford* there were further expressions and manifestations which showed that the donee treated the appointive property as her own. Here, by way of contrast, the manifestations are to the contrary. The cases of *Northern Trust Co.* v. *Porter*, 368 Ill. 256, and *Logan* v. *Harris Trust & Savings Bank*, 8 Ill. App. 2d 61, upon which appellees also rely do not help them. In *Porter* there was no attempt on the part of the donee of the power to treat the property subject to the power as her own; in *Logan* the only issue was whether the donee had intended to exercise his power.

Considering the will in its entirety we do not find the requisite intent of the donee to make the property a part of his estate for all purposes. This being so, the appointee takes from the estate of the donor as in the normal case. For this reason, it follows that the orders of the probate court were in error insofar as they ordered the appointive assets to be surrendered to and inventoried in Oscar's estate, and ordered the executor to file an additional bond of $800,000.

This brings us to the orders of the probate court which disapproved the executor's first account, and appointed a special administrator to represent the estate both in that matter and to receive the final report of the trustees of the Kathryn Breault trust. Despite appellants' vigorous con-

tentions to the contrary, it is our opinion that those orders were correct.

Oscar was entitled to the income from his mother's trust until the day of his death, and we believe it requires neither extended discussion nor elaborate citation of authority to establish that Oscar's estate had a claim against the trustees for any income undistributed at the time of his death, and was likewise entitled to an accounting from the trustees for the period extending between the date of the third and last trustees' report approved by Oscar in his lifetime and the date of his death. Such a claim was not included in the executor's first account and in looking to such circumstance we are not unmindful that Feigenholtz, in his capacity as administrator to collect, accepted and approved a fourth and final report of the trustees subsequent to Oscar's death. In so doing, however, he exceeded his authority.

An administrator to collect is a temporary officer and his duties are limited strictly to those prescribed by statute. (See: *Jacob Wener & Co.* v. *Freilich,* 268 Ill. 58, aff'g. 188 Ill. App. 577; *People ex rel. Bulkley* v. *Salomon,* 184 Ill. 490; *Dow* v. *McArthur,* 239 Ill. App. 539.) Under our present statute, unless leave of court is obtained, those duties are to sue for and collect the personal estate and debts due the decedent, and thus to preserve the estate until an executor or an administrator is appointed. (Ill. Rev. Stat. 1961, chap. 3, par. 107.) By no stretch of the imagination do we believe the statutory language could be construed as giving Feigenholtz, in his capacity as administrator to collect, the authority to release the claim against the trustees and to approve their account. Furthermore, there is a more compelling reason why the approval was ineffective in this case. Section 108 of the Probate Act (Ill. Rev. Stat. 1961, chap. 3, par. 108.) provides that the powers of an administrator to collect shall cease on the issuance of letters testamentary. Here such letters issued on October 15, 1959, and

the purported approval as administrator to collect was given on October 21, 1959, six days later. For these reasons the probate court quite properly disapproved the executor's first account, and because of the dual position of trustee and executor occupied by Feigenholtz, quite properly appointed the special administrator.

In this court, as they did below, the appellees have bitterly attacked the administration of the Kathryn Breault trust, and have sought to claim an accounting running from the inception of the trust. We agree with the probate court, however, that these matters go beyond the issues of the case and the jurisdiction of the probate court, and that appellees are not without a remedy or a tribunal to pursue such claims should they so desire.

The facts attendant to the appellees' cross-appeal from the probate court's refusal to remove Feigenholtz as executor would unduly extend this opinion for no beneficial purpose. We are convinced, however, that the court did not abuse its discretion in such respect. It has long been established that letters testamentary may be revoked only for reasons stated in the statute, (*Clark* v. *Patterson,* 214 Ill. 533; *Healea* v. *Verne,* 343 Ill. 325,) and the authorities likewise concur that an executor should not be removed for errors or omissions which are satisfactorily explained, errors of judgment not amounting to malfeasance, or error in the construction of a will in the absence of wilful misconduct, or bad faith. See: 33 C.J.S. Executors and Administrators, sec. 90 f; *In re Lussem's Estate,* 285 Ill. App. 311; *Estate of Buchman,* 123 Calif. A. 2d 546, 267 P.2d 73.

We agree with the probate court that appellees' proof was insufficient to establish any of the statutory grounds for removal, and while we doubt the wisdom of several of the executor's actions, which could have been obviated by a suit for directions or a construction of the will, we see neither waste, wilfulness nor bad faith which would justify our interference with the lower court's discretion.

For the reasons and in the respects stated the orders of the probate court of Cook County are affirmed in part and reversed in part, and the cause is remanded to that court with directions to proceed in accordance with the views expressed in this opinion.

*Affirmed in part and
reversed in part and
remanded, with directions.*