Illinois State Trust Company, Plaintiff and Counterdefendant-Appellee, *v.* The Southern Illinois National Bank, Defendant, Counterdefendant, Counterclaimant and Cross-Appellant.—(Shriners Hospitals for Crippled Children, Defendant, Counterdefendant, Counterclaimant-Appellant, *v.* Dorothy L. Chenoweth *et al.*, Defendants and Counterclaimants-Appellees.)

(No. 74-277; <span style="background:black">            </span>

Fifth District—May 29, 1975.

Harold G. Baker, Jr., and John M. Ferguson, of Belleville, and Charles E. Herzog, of Bell, Boyd, Lloyd, Haddad & Burns, of Chicago, for appellant Shriners Hospitals for Crippled Children.

Howard Boman, of Dunham, Boman, Leskera & Churchill, of East St. Louis, for cross-appellant Southern Illinois National Bank.

C. E. Heiligenstein, of Belleville, for appellee Louis Ward.

James O. Brooks and Joseph W. Grady, of Brooks & Grady, of Chicago, for appellees Irene Brooks and Donald Oehmke.

Phillips, Phebus, Tummelson & Bryan, of Urbana (Darius E. Phebus and Joseph W. Phebus, of counsel), for appellees Dorothy L. Chenoweth *et al.*

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

This is an appeal by defendant-appellant, Shriners Hospitals for Crippled Children, from orders entered by the circuit court of St. Clair County

denying its counterclaim for a declaration that the residuary clause contained in the will of Jane W. Oehmke, deceased, was insufficient to exercise the testamentary power of appointment conferred upon her by the trust provisions of her late husband's will.

In his will, Martin F. Oehmke established a trust. Under the trust Oehmke's wife, Jane W. Oehmke, was to receive all of the income from such trust and she could withdraw up to $10,000 of the principal of such trust each year. The trust specified that upon the death of Jane W. Oehmke, the principal and undistributed income of the trust assets should be "distributed to or for the benefit of such person or persons, or the estate of my wife in such amount and proportions as my wife shall appoint by her will." Such trust further provided in default of the exercise of such power of appointment or "insofar as such appointment shall not extend to or take effect," the trustee should

> "* * * pay any and all inheritance and Federal estate taxes that may be assessed in any way by reason of her death, her funeral expenses and the expenses of her last illness, and the balance, if any, shall be distributed unto Shriners Hospital for Crippled Children, a corporation, to be used exclusively for the benefit of the hospital located in the City of St. Louis, Missouri, owned, operated and maintained by said corporation."

Upon Jane W. Oehmke being declared incompetent in September 1969, and her conservator, The First National Bank of Belleville, requesting the annual withdrawal of $10,000 on their ward's behalf, the testamentary trustee, the Illinois State Trust Company, plaintiff-appellee, filed a complaint in the circuit court of St. Clair County requesting such court to consider the last will and testament of Martin F. Oehmke, deceased, and direct the plaintiff in the manner in which the income and corpus of the trust created thereunder should be distributed. The First National Bank of Belleville, as conservator for Jane W. Oehmke, widow of the deceased Martin F. Oehmke, filed an answer praying for a declaration that it be entitled, under the trust, to receive $10,000 every year it makes a demand on behalf of Jane W. Oehmke. The matter had not been disposed of at the time of Jane W. Oehmke's death, and the final judgment order in this cause provided that in the event this cause was reversed, the trustee should pay to the administrator a sum equal to State inheritance taxes and Federal estate taxes assessed by reason of the death of Jane W. Oehmke, and her funeral expenses and last illness expenses, and that the annual payments of $10,000 requested by the conservator and subsequently claimed by the administrator of Jane W. Oehmke's estate were to be denied. We are not, in view of our affirmance, concerned with those provisions.

Upon the death of Jane W. Oehmke, The Southern Illinois National

Bank of East St. Louis, as administrator of the estate of Jane W. Oehmke, filed a motion to substitute it for the First National Bank of Belleville. Such motion was granted. Thereafter the plaintiff filed a motion for leave to file an amended complaint substituting Shriners Hospitals for Crippled Children, appellant, for Southern Illinois National Bank. Leave was granted and the amended complaint was filed. The Shriners Hospitals for Crippled Children filed an answer to plaintiff's amended complaint. Included therein was a counterclaim for an adjudication and a declaration determining whether or not the will of Jane W. Oehmke was sufficient to exercise the testamentary power of appointment conferred upon her by her husband's will.

The will of Jane W. Oehmke, dated February 8, 1965, provided for specific bequests of $50,500 and for,

> "All the rest, residue and remainder of my Estate of every name and nature, and whatsoever situate, of which I shall die seized or possessed, I give, devise and bequeath as follows:
>
> (a) A one-third part thereof unto Illinois State Trust Company, in trust nevertheless, as trustee for my nephew, Louis Ward, * * *;
>
> (b) A one-third part thereof unto Russell Herseth also sometimes known as Russell Severin; and
>
> (c) A one-third part thereof unto Leona Herseth, also sometimes known as Leona Severin.
>
> &ast; &ast; &ast;"

The primary issue before this court is whether the foregoing provision of the will of Jane W. Oehmke was sufficient to exercise the testamentary power of appointment conferred upon her by her husband's will.

■■ It is well settled that the question of whether a testamentary power of appointment has been exercised depends upon the intention of the donee of such power. (*Funk v. Eggleston*, 92 Ill. 515. See also *Rettig v. Zander*, 364 Ill. 112, 4 N.E.2d 30; *Merchants' Loan & Trust Co. v. Patterson*, 308 Ill. 519, 139 N.E. 912; *Northern Trust Co. v. Moscatelli*, 54 Ill. App.2d 316, 203 N.E.2d 447.) It is equally well settled that the burden of proof rests upon the party claiming the exercise of the power of appointment. (*Emery v. Emery*, 325 Ill. 212, 156 N.E. 364. See also *In re Estate of Breault*, 29 Ill.2d 165, 193 N.E.2d 824; *Merchants' Loan & Trust Co. v. Patterson*, 308 Ill. 519, 139 N.E. 912.) The donee's intention to exercise a power of appointment, however, need not be manifested in any given way. (*McGee v. Vandeventer*, 334 Ill. 305, 165 N.E. 151.) Technical language is not necessary to the exercise of a power of appointment (*Merchants' Loan & Trust Co. v. Patterson*, 308 Ill. 519, 139 N.E. 912); nor is it necessary that the intention to execute the power appear by express terms or recitals (*Boyle v. John M. Smyth Co.*, 248 Ill.App. 57). In other words, "[r]eference to the power is not essential, and the instrument need

not take the slightest notice of it, provided the intent to exercise the same appears." (*Hopkins v. Fauble*, 47 Ill.App.2d 263, 265, 197 N.E.2d 725.) Such intention may be sufficiently manifested by the circumstances surrounding the transaction. (*Rettig v. Zander*, 364 Ill. 112, 4 N.E.2d 30; *Northern Illinois Trust Co. v. Cudahy*, 339 Ill.App. 603, 91 N.E.2d 607; *Northern Illinois Trust Co. v. House*, 3 Ill.App.2d 10, 120 N.E.2d 234.) The foregoing decisions are summarized succinctly in *Northern Trust Co. v. Moscatelli*, 54 Ill.App.2d 316, 327, 203 N.E.2d 447, wherein the court stated,

> "It thus appears clear that under Illinois law the intention of the testator supercedes the formal requirements with respect to the exercise of a power of appointment, and that extrinsic evidence may be introduced to show that intention. Funk v. Eggleston, supra; Rettig v. Zander, supra; Northern Trust Co. v. Cudahy, supra. The primary object in the instant case is therefore to discover the testator's intention."

Likewise, in the instant case the ultimate test for determining whether the power has been exercised by the general residuary clause depends upon the intention of the testator. Such a determination requires a review of the testimony presented in the trial court.

The first witness to testify was Ralph Green, vice president, trust officer, at Illinois State Trust Company. He testified that Illinois State Trust Company was appointed as trustee under the will of Martin E. Oehmke. He further testified that this account was originally handled by Alexander J. Nester.

The next witness to testify was Leona "Severin" Herseth. After a few preliminary inquiries the witness was asked about her acquaintance with Jane and Martin Oehmke. At this point attorney for appellant objected, stating, "Your Honor, under the Dead Man's Act. She has a claim against the Estate. She can't testify." The trial court overruled the objection and properly stated that, "You will have to make specific objections to specific questions if you want the application of the Dead Man's Act to apply." After the questioning of the witness resumed, the witness stated that she had been employed as a secretary by William C. Dunham. William C. Dunham practiced law in a partnership with Martin E. Oehmke. During the course of the witness' employment she became acquainted with Jane and Martin Oehmke, and with Jean Oehmke Herseth, Jane Oehmke's daughter. The witness testified that she became close friends with Jean Oehmke. After the death of Jean Oehmke in 1950, the witness continued her association with Jane Oehmke. Subsequently, in 1961, the witness married Russell Herseth, the Oehmke's former son-in-law. The witness testified that she continued her relationship with Jane Oehmke after her own marriage and after the retirement of Martin Oehmke. For a "long

while" after the death of Martin Oehmke, Jane Oehmke slept at the witness' home. After refusing Jane Oehmke's suggestion that the witness and her husband move into the Oehmke home, the witness agreed with Jane Oehmke that both homes be sold and a larger home be bought, in which they could live together. This was accomplished and the witness, the witness' husband, her husband's mother and Jane Oehmke lived together from sometime in 1964 until August 1968. They lived together on February 8, 1965. The witness and her husband moved to St. Louis in August, 1968. Jane Oehmke moved into the Ward home, which was occupied by Louis Ward, her nephew, and his mother. On December 23, 1969, the witness and her husband moved to California.

On cross-examination it was elicited that the $24,000 Jane Oehmke received from the sale of her home went into the purchase of the large house in which she lived with the witness. Title to the new residence was placed in the name of the witness and the witness' husband. The proceeds of sale of Jane Oehmke's home were reinvested in homes purchased by the witness and her husband and were not returned to Jane Oehmke. The witness further testified that "Jane gave us the home—she wanted to give, moreso [sic]." An additional $30,000 was withdrawn from the trust (established by Martin Oehmke) by Jane Oehmke and was given to the witness and her husband. While Jane Oehmke was living with the Herseths' she turned over some bonds and savings to the witness' husband, Russell Herseth. The witness estimated the value of these gifts at around $17,000.

Upon further examination the witness testified that Jane Oehmke treated her husband as a son and continued to do so after the death of his former wife, Jean Oehmke. The following colloquy then occurred,

"Q. During the time you lived with her were they as close as you were with Mrs. Oehmke following February 8, 1965, which was the date of her will, did she ever discuss her state of mind as to the disposition of her Will with you?

MR. BAKER: I will object to the Dead Man's Statute on that, Your Honor.

THE COURT: Show the objection as overruled.

A. Well, of course, her expression always was that Russ and I were her children, she called us her children and Buddy she thought a lot of—she would always say, my children and Buddy should get what I have.

Q. Who was Buddy?

A. Mr. Ward. She always talked about that she couldn't understand why Mr. Oehmke put her money in a trust account.

MR. BAKER: I move to strike, Your Honor, Dead Man's Statute.

THE COURT: The objection is overruled.

Q. Leona, so if I understand your testimony then, after February

8, 1965, which was the date of her Will, she expressed an intent that the bounties of her estate, or her power to dispose of funds were you, Russ and Louis Ward.

MR. BAKER: Object, Your Honor, Dead Man's Statute, and in addition to that, it calls for a legal conclusion from the witness.

THE COURT: The objection is sustained as to the legal conclusion, I have not sustained the Objection as to the Dead Man's Act.

Q. Leona, then if I understand you correctly, did Mrs. Oehmke express or make statements concerning who she wished property that she had the power to dispose of or give away—to whom she wanted it given to?

MR. BAKER: Same objection, Your Honor.

THE COURT: You will have to state your objection.

MR. BAKER: The legal conclusion and the Dead Man's Act.

THE COURT: Show as to the legal conclusion that is overruled and as to the Dead Man's Act, that is overruled.

Q. You may answer that.

A. Well, she always felt her money should go to us and Mr. Ward —this is what she wanted.

Q. And are these the statements that she made?

A. Yes, time and time again.

\*    \*  .  \*

Q. I realize Leona, that you can't probably pick out specific dates, could you tell us what periods between February 8, 1965 and September 26, 1969, which was her adjudication of incompetency, what general time period, or what times in what particular year did she mention Shriner's Hospital to you?

A. Oh I would hear it once a week, but I couldn't say exactly the time and date.

Q. On a regular basis?

A. Yes, this was a worry to her.

\*    \*    \*

Q. And with reference to Shriner's Hospital, did she ever make any statements to you as to whether or not she intended any of the money that she had the power to dispose of in her estate to go or not to go to Shriner's Hospital.

MR. BAKER: Your honor, on the grounds I stated previously, it calls for a legal conclusion and opinion, it's self-serving, and it's contrary to the Dead Man's Act.—I object on those grounds.

THE COURT: Show the objection as overruled.

MR. HEILIGENSTEIN: You may answer that.

A. Yes, she did not want the money to go to Shriner's.

MR. BAKER: I am going to move to strike the answer, Your Honor, it's not responsive.

THE COURT: Motion to strike the answer denied."

The witness also testified that after the death of Martin Oehmke she had a "very close relationship" with Jane Oehmke. The witness classified this relationship as "Mother and daughter." The witness described various activities she enjoyed with Jane Oehmke, including several vacations which they had taken together. The witness testified that she addressed Mrs. Oehmke as "Aunt Jane." The witness stated that Russell always addressed Mrs. Oehmke as "Mom." When asked to described the mental condition of Mrs. Oehmke following Martin's death, but before the adjudication of incompetency, the witness stated, "Well she would be a little forgetful at times—she was sad, we knew that, and a very lonesome person living in that house—but she was fun and her mind was fine." The witness never noticed anything during this time to indicate that Mrs. Oehmke might not have been of sound mind.

On recross-examination by Mr. Baker, he asked, "Did she express some feeling about not wanting Shriner's to get any part of the estate, is that right?" The witness answered affirmatively. The question was rephrased, "From the time Martin died Jane said she didn't want anything to go to Shriner's, right?" The witness again answered affirmatively.

The next witness was Zlara Zayic, Leona Herseth's Aunt. The witness stayed with Jane Oehmke during the day, after Jane had moved in with Leona Herseth. From sometime in 1964 until "the first of 1968," the witness was with Jane Oehmke at least 5 days a week. The following inquiries were then made to, and answered by, the witness:

"Q. Did she speak of the Shriner's Hospital in connection with that [the trust] money?

A. Yes, she'd say they didn't need it, she said she wanted to leave it to her loved ones—that is all she said.

Q. Did she express herself anymore with respect to Shriner's Hospital?

A. She'd just say they weren't deserving of that money and that that money was hers.

\*    \*    \*

Q. Who did she mean, from what you could tell, when she said my loved ones?

A. She always spoke of Russ as her son, and her friends Carolyn, Jackson and Grace, and Leona as honey, she had some in Champaign or Chicago and she'd always speak of them.

Q. She didn't include the Shriner's Hospital?

A. No—no."

The witness later stated that Jane Oehmke gave her nephew, Louis Ward,

and his mother a television, an air conditioner, a gun and an overcoat for "Bud" (Louis Ward). Jane also "gave him money all the time." Jane Oehmke paid the witness' wages; however, except for Christmas presents, Jane Oehmke did not make her any gifts.

The next witness called to testify was Mary Distler, the sister of Louis Ward's mother. After Jane Oehmke moved in with Louis Ward the witness took care of both her sister (Louis' mother) and Mrs. Oehmke. On direct examination the witness testified that Jane Oehmke wanted Louis Ward to "have everything I have." Louis Ward was Mrs. Oehmke's only natural relative, her brother's son. The witness never heard Mrs. Oehmke say she wanted Shriners to have the money and, in fact, the witness received just the opposite impression. On cross-examination the witness was asked, "Did she ever tell you, I'm going to make certain they [Shriner's] don't ever get anything?" The witness replied, "Well I believe she said something to that effect." The witness also recalled that Jane Oehmke purchased an automobile for Louis Ward.

Another witness called to testify was Alexander J. Nester. He was a trust officer at Illinois State Trust Company from 1963 until 1968. During the course of his employment at Illinois State Trust Company he was involved in the administration of the estate of Martin F. Oehmke. The witness knew Jane Oehmke for "quite a while." During the course of the administration of her husband's estate he had occasion to advise her of the provisions of Martin Oehmke's will as such related to the trust created thereunder. The witness prepared the individual income tax returns for Jane Oehmke through 1966 or, possibly, through 1967. While the witness stated that "he could not testify with complete certainty" regarding Jane Oehmke's assets, aside from the trust, on February 8, 1965, he was able to give "some approximation of her assets." The witness then listed the assets Jane Oehmke owned at the time of her husband's demise. They consisted of the following, (1) a home on Signal Hill Boulevard, (2) beneficial interest in four life insurance policies, (3) two other policies which paid her approximately $7,000, (4) a savings account in the amount of $5,600, (5) a joint checking account containing in excess of $7,000, (6) Series E Bonds aggregating somewhat over $7,000, (7) a 1952 Cadillac, (8) a 1953 Chevrolet and, (9) stocks aggregating roughly $15,000. The witness explained to Jane Oehmke that she had the power to execute a testamentary power of appointment under the trust. The value of the trust at the time of its creation was approximately $180,000. The witness believed that the trust had a like value on February 8, 1965. For estate purposes the value of two automobiles was $400. The only assets not previously listed consisted of Social Security benefits and household furniture. The witness stated that the value of the stock owned by Jane Oehmke was worth between $15,000 and $18,000. Jane Oehmke was aware of her power to appoint the

principal of the trust during her lifetime and, in fact, did appoint $30,000 to Russell and Leona Herseth in 1967. Jane Oehmke never told the witness that she intended to exercise her testamentary power of appointment, nor that she was "going to make certain that the property never went to Shriner's." The witness testified that the house on Signal Hill Boulevard was sold prior to February 8, 1965. Jane Oehmke never indicated, "one way or the other," whether or not she intended to exercise the testamentary power of appointment. Similarly, Jane Oehmke never indicated one way or another whether or not she did or did not intend for Shriner's to take part of the trust.

The final witness to testify was Howard Boman. He was an attorney who had worked for Martin Oehmke and Bill Dunham. He testified that Bill Dunham has been unable to communicate for several years. From the notes he found in Bill Dunham's files and from the handwritten notes on certain drafts of Jane Oehmke's will, the witness reached his opinion that Bill Dunham had drafted Jane Oehmke's final will.

· The ledger sheets from the First National Bank of East St. Louis, which were received into evidence, revealed that Jane Oehmke had $8,756.28 credited to her checking account and $9,815.43 deposited in her savings account as of February 8, 1965. In a letter dated February 14, 1964, A. J. Nester advised Mrs. Oehmke that the trust department had received three insurance checks totaling $9,788.49, which were deposited in her accounts at First National Bank of East St. Louis. The will of Jane Oehmke, which was received into probate, made specific pecuniary bequests aggregating $50,500 to numerous parties other than the residuary legatees. The will was dated February 8, 1965.

■■■ Before examining the foregoing evidence we will address the appellant's contention that the trial court erred in overruling his objections to testimony purporting to show Mrs. Oehmke's intention to exercise her testamentary power of appointment. We find no merit in this contention. The appellant's objections were on the basis of the dead man's act (Ill. Rev. Stat. 1971, ch. 51, par. 2) and on the basis that certain questions called for legal conclusions. Since appellant is not suing or defending as a representative of a deceased, appellant is not a protected party under the dead man's statute insofar as the will of Jane Oehmke is concerned (Ill. Rev. Stat. 1971, ch. 51, par. 2), and further, since the claims of the residuary legatees cannot be said to impair the estate of the deceased Jane Oehmke, we find no applicability of the dead man's statute. (See *Mortimer v. Mortimer*, 6 Ill.App.3d 217, 285 N.E.2d 542; *Alward v. Woodward*, 315 Ill. 150, 146 N.E. 154; *Gage v. Eddy*, 179 Ill. 492, 53 N.E. 1008. See also Gard, Illinois Evidence Manual Rule 409, at 507 (1963).) Similarly, the appellant's objections on the basis of legal conclusion were not well taken.

Our review of the appellant's cited instances of error reveals that the trial court ruled properly with respect to the appellant's stated objections. While there may have been objections which could have been made and sustained, for example, hearsay, these objections were not raised by the appellant and are deemed waived. *Forest Preserve District v. Lehmann Estate, Inc.* 388 Ill. 416, 58 N.E.2d 538; *People ex rel. Blackmon v. Brent,* 97 Ill.App.2d 438, 240 N.E.2d 255.

■■ Finally, we find sufficient evidence in the record to sustain the trial court's finding that the testator, Jane Oehmke, intended to exercise her testamentary power of appointment by her will dated February 8, 1965. It is undisputed that prior to such date Jane Oehmke was advised orally and in writing of her right to exercise such power. There was sufficient evidence to establish that absent the exercise of such power, the personal assets of Jane Oehmke, as of February 8, 1965, would have been insufficient to satisfy the specific bequests, much less the residuary legacies, contained in her will. There was also substantial evidence presented to establish that the residuary legatees were the primary objects of Jane Oehmke's bounty. This conclusion is supported not only by the testimony of several witnesses, but by the undisputed fact that Jane Oehmke made substantial gifts to each of the residuary legatees during her lifetime. More significant, however, from the standpoint of the instant case, was the testimony of several witnesses that Jane Oehmke disapproved of her husband's bequest to the Shriners' Hospital and her alleged statements that she did not want Shriners to receive her money.

When these circumstances are evaluated in light of the fact that "[t]he lodestar of will construction is to ascertain and effectuate the intention of the testator, provided such is not contrary to law * * *" (*Carr v. Hermann,* 16 Ill.2d 624, 628, 158 N.E.2d 770; see *Whittington v. Hunt,* 296 Ill. 133, 138, 129 N.E. 543), and the fact that "the intention of the testator supercedes the formal requirements with respect to the exercise of a power of appointment * * *" (*Northern Trust Co. v. Moscatelli,* 54 Ill.App. 2d 316, 327, 203 N.E.2d 447), no error can be found in the trial court's order finding that the residuary clause of Jane Oehmke's will was sufficient to exercise the testamentary power of appointment conferred upon her by the trust provisions of her late husband's will. Accordingly, we affirm the orders entered by the circuit court denying appellate's counterclaim for a declaration that such residuary clause was insufficient to exercise such power of appointment.

Orders affirmed.

JONES, P. J., and G. MORAN, J., concur.