Northern Trust Company, Trustee under Indenture of Trust of Michael John Cudahy, Deceased, Appellee, v. Edna Cudahy et al., Appellees.
Appeal of Mary Cudahy et al., Appellants.

Gen. No. 44,607.

Opinion filed February 10, 1950. Released for publication March 15, 1950.

McBride & Baker, of Chicago, for appellants; Lloyd M. McBride, Edward H. Baker, Jr., Harvey Wienke, and George M. Schlosser, all of Chicago, of counsel.

Frederick Mayer, of Chicago, guardian *ad litem pro se.*

Herman M. Silverstein, of Chicago, for certain appellee; Julius J. Silverstein and Stanley Zimmerman, both of Chicago, of counsel.

William J. Froelich, Jacob I. Grossman, and Seymour Tabin, all of Chicago, for certain other appellees; Seymour Tabin, of Chicago, of counsel.

Sarsfield Collins, guardian *ad litem,* of Chicago, for certain appellees.

Mr. Presiding Justice Friend delivered the opinion of the court.

On April 25, 1941, Michael John Cudahy (hereinafter referred to as Cudahy) created a trust, naming

the Northern Trust Company as sole trustee, under the terms of which he provided that monthly payments be made to himself and that upon his death the trust estate should be disposed of in such manner as he might appoint by his last will and testament. Provision was also made for the disposition of income and principal in default of his exercise of the testamentary power of appointment. Cudahy died February 14, 1947, while domiciled in California, leaving a will and codicil which were admitted to probate in that state. After his death the Northern Trust Company filed in chancery the complaint herein as trustee under the *inter vivos* trust for the purpose of having the court determine whether or not Cudahy in his will and codicil exercised the power of appointment which he reserved in the *inter vivos* trust. The chancellor found and ruled that Cudahy had exercised the power in his will and codicil, and entered a decree from which Mary Cudahy, his sister, Marjory Lithander Stanier, his niece, and Maud Lithander Cheuvronts, another niece, have taken an appeal. The decree also provided that the trustee should distribute the income and principal to the legatees and beneficiaries named in the will and codicil, and that any unpaid claims, taxes, fees, costs of administration and bequests not paid in full out of Cudahy's estate should be paid out of the *inter vivos* trust.

There is substantially no dispute as to the salient facts. From about 1914 until he died on February 14, 1947, Cudahy was domiciled in the State of California. In 1941, a trust created by his father, John P. Cudahy, was disbursed to the latter's children, Michael John Cudahy, Anne Cudahy Clifton, Mary Cudahy and Edna Leuhusen, in four equal shares. With part of his distributive share Cudahy created an irrevocable trust, dated April 25, 1941, whereby he provided for a certain life estate payable to himself in an amount not to exceed $1,000 per month, and also reserved to himself

605

a testamentary power of appointment so that by his will he could dispose of the entire trust estate. In default of his exercise of the power, he provided in trust that the entire net income would be payable to his mother Edna C. Cudahy if she survived him, and that upon her death, if she survived him, or upon his death if she did not survive him, the trust estate would in effect be distributed to his heirs. He left no wife or children, and was survived only by his mother Edna C. Cudahy, and his three sisters, Anne Cudahy Clifton, Mary Cudahy and Edna Leuhusen. During the pendency of these proceedings in the circuit court Edna Leuhusen died, leaving her surviving her two daughters Marjory L. Stanier and Maud L. Cheuvronts.

On January 6, 1942, Michael John Cudahy executed a will, and on January 23, 1943, a codicil thereto. The will provides for the payment of debts, taxes, costs of administration, etc., and makes bequests of two per cent of his estate to his mother Edna C. Cudahy, two per cent to Raymond Glenn, the son of his sister Anne Cudahy Clifton, 25 per cent to his friend James Stacy, who "handled his business as a friendly manager," for many years, without compensation, and in the codicil $10,000 to Stacy's daughter Elaine Stacy. The residue goes to a testamentary trust, with the entire net income payable to his mother Edna C. Cudahy if she survives him. Upon the mother's death or Cudahy's death if his mother predeceased him, his sister Anne Cudahy Clifton receives a life estate in the entire net income. Her son Raymond Glenn is the remainderman for the entire estate after the various life estates.

Those appealing in this case would have taken under the *inter vivos* trust as remaindermen with respect to a portion of the principal had the court below ruled there had been a default in the exercise of the power, but they take nothing under the present decree for they are not named in the will. The other defendants consist

of two groups; some take only under the will and codicil and hence benefit from the trust only if the power was exercised; others would take under the trust in default of the exercise of the power, but, in general, having been named in the will, would take more under the will if the power was exercised.

The rule and guiding principles by which courts are to determine whether the power of appointment has been exercised may be ascertained from several of the leading cases in this state, one of the earliest of which is *Funk v. Eggleston,* 92 Ill. 515, decided in 1879. In that case Sarah Funk was given a life estate and the power of appointment by the will of her husband, Absalom Funk. She died testate, and the question for determination was whether she had exercised the power given by her husband's will. The clause of her will by which she was held to have exercised the power of appointment was as follows: ''All and singular the rest, residue and remainder of my estate, real and personal, of whatever kind and wheresoever situate, I hereby order and direct to be converted into money by my executors hereinafter named, and for that purpose I do authorize and empower them to bargain, sell and convey my real estate wherever situate, and to make, execute, acknowledge and perfect all deeds and conveyances in law necessary to assure in the purchaser or purchasers thereof the full title thereto, the said real estate to be sold as soon as the same can be done without sacrifice, in the discretion of said executors.'' Prior to her death the testatrix had purchased the undivided one-third of certain described real estate which had been bequeathed by her husband to his illegitimate daughter. This gave her the fee in the undivided one-third of the land in question, and by her husband's will she held a life estate in and the power of appointment in the remaining two-thirds. After a searching analysis of the law, the court dis-

claimed the technical English rule that only the following three specific situations demonstrate intention: (1) where there was a reference to the power in the will, (2) where there was a reference to the subject of the property covered by the power, or (3) where the instrument would be inoperative without the aid of the power, and declared the Illinois rule to be the liberal rule announced by Mr. Justice STORY in *Blagge v. Miles,* 1 Story 427, as follows: ". . . intention, however manifested, whether directly or indirectly, positively or by just implication, will make the execution valid and operative." In reaching the conclusion that by her reference in her will to "my estate, real and personal," she intended to and did exercise the power of appointment over the property of her husband, the court relied for proof of intention on evidence that the donee knew of the power and took into consideration her two interests in the land, namely, the one-third in fee and the life estate in the remaining two-thirds; and also of the fact that she had ordered her executors to make immediate sale of her real estate, and that in the absence of the exercise of the power the donor's devisees would get an undivided one-third and 222 of the donor's heirs would take an undivided two-thirds. Sarah Funk had bequeathed a watch to her husband's nephew and called it "my gold watch," and the household furniture to her daughters which she referred to as "all my household furniture." Evidence *dehors* the will showed that the watch and most of the household goods had been her husband's property, and the court held that these references to the personal property as being hers were additional evidence of her intention to exercise the power of appointment. "It is a question of intention," said the court. "If it were only admitted that the rules by which that intention may be ascertained were not fixed and settled, then it can not be doubted but that the evidence afforded by this will

608

and this record establishes that intention beyond a reasonable doubt. If the intention is clear and manifest, it is all that is required by that which we have designated as the fundamental rule; to require more would be, as is suggested by Justice STORY, to make 'the cases govern the general rule as to intention, and not the rule the cases.' The demands of substantial justice do not require we should follow the subtle niceties of some of the English cases; and such course would be inconsistent with the liberal rules we have heretofore announced should govern in the ascertainment of the intentions of testators.'' In conclusion the court said that ''there are no former decisions of this court that militate against the rule we now announce. . . . We prefer, then, to follow the broad and liberal rule announced by Lord COKE in *Scrope's case* [10 Co. 144], and by Mr. Justice STORY in *Blagge v. Miles,* and that is based upon principle, and thus carry into effect the intention of the testatrix, rather than to defeat such intention by following the narrow and technical rule predicated upon the cases. The provisions of the whole will taken together and the facts *dehors* the will clearly indicate, to our minds, an intention to pass the whole estate, and we think the devise should, in favor of the intention, be held to work both by the interest and by the power, and to pass the entirety.'' That decision has never been departed from in this state, and has been cited with approval by many other courts in passing upon the question of whether a donee had exercised a power of appointment.

Appellants rely on *Emery v. Emery,* 325 Ill. 212, 156 N. E. 364, and say that ''the entire law of Illinois on this point [the question in controversy] is embodied'' in that decision. There were no surrounding circumstances in that case, the only evidence offered being two wills which the court was called upon to construe, and in doing so said: ''The will . . . did not on its face

purport to exercise the power . . . . It was not necessary that it should do so. If he intended to act under the power and executed the will for the purpose of exercising the power his act constituted an appointment, but to have that effect a certain ascertainment of his intention to act under the power is essential. It is not necessary that the intention appear on the face of the instrument itself. It may be manifested in other ways, but it must be apparent and clear, so that the transaction is not fairly susceptible of any other inter- ·pretation. If it be doubtful under all the circumstances, then that doubt will prevent it from being deemed an execution of the power.'' Appellants interpret this as indicating approval of the old and technical English rule which was expressly repudiated in the *Funk* case with the comment that ''the artificial rule, predicated upon former experience, must give way, and the primary and fundamental rule, which requires only that the intention be made clear and manifest, would prevail.'' In other words, the *Funk* case decided that the three situations which were held in the early English decisions to demonstrate the absolute certainty that there was an intention to exercise the power do not *exclude* others where intention is equally apparent. Moreover, much of the discussion in the *Emery* case was *dicta* because the court had before it only the wills which it was called upon to construe, without any testimony or other evidence to aid it in arriving at the intention of the testator.

██ The rule in Illinois is clear; intention, however manifested, will make the execution of a power valid and operative, and in ascertaining intention the words of the will are to be read in the light of circumstances under which it was executed; and while parol evidence is not properly admitted to show what the testator intended to write, it may be admitted where its effect is merely to explain or to make certain what

the testator has written. This rule is confirmed in *Rettig v. Zander*, 364 Ill. 112, 4 N. E. (2d) 30 (decided after the *Emery* case), wherein the court said: "The circumstances under which the will was written properly include the nature, extent and condition of the testator's property, the relations between the testator and his family, and his relations to the .beneficiaries named in his will." *Funk v. Eggleston, supra*, was relied upon, fully discussed, and quoted with approval in the *Rettig* case, and *Emery v. Emery, supra*, was distinguished in the following language: "We pointed out in that case that there were no surrounding circumstances. The only evidence offered was the two wills, so that the situation there was entirely different from the case before us and from that in *Funk v. Eggleston*." *Foster v. Grey*, 96 Ill. App. 38, and *Merchants' Loan & Trust Co. v. Patterson*, 308 Ill. 519, 139 N. E. 912, confirm the rule of intention.

■ In the case at bar appellees adduced considerable evidence bearing upon Cudahy's intent to exercise the power. The chancellor found "that at the time he made his Last Will and Testament, Michael John Cudahy was aware of the existence of said power of appointment; that at that time he had virtually no property other than that over which he reserved power of appointment; that his mother, Edna C. Cudahy, his sister, Anne Cudahy Clifton, and his nephew, Raymond Glenn, were the primary objects of his bounty." There is ample evidence to support these findings. Cudahy himself created the power and was undoubtedly aware of its existence. At the time he created the trust in 1941 he placed therein virtually all his property and had no income other than that which he received from the trust up to the time of his death, except his pay as a private, first class, in the Army of the United States; nevertheless, his will displayed the clear expectation that his estate would be very substantial. He

gave his nephew Raymond Glenn two per cent of his estate "with the hope that my said nephew will use the same to further his education," indicating that he expected that two per cent to amount to a substantial sum. He set up a complicated testamentary trust giving income for life to one beneficiary, income for life to another beneficiary upon the death of the first beneficiary, and the remainder on the death of the second to a third beneficiary. He directed the testamentary trustee to pay inheritance and estate or income taxes, and therefore certainly expected his estate to be large enough to be subject to those taxes. If he was not exercising his power of appointment and thereby disposing of the property held in his living trust, he would clearly have been doing a meaningless and useless act and creating an inoperative last will and testament, because the evidence shows that he had substantially no assets outside the property which he placed in trust and over which he had power of appointment. Even under the technical old English rule, the will and codicil would have been inoperative without the aid of the power.

Appellants contend, however, that Cudahy had other property, including a beach house and at least part of $26,000 which the Northern Trust Company paid him in response to his request in 1946, to be invested in a motion-picture enterprise. His friend Stacy testified that he had no other property, and the chancellor evidently so found because in the course of Edna C. Cudahy's examination, when questions were asked as to the ownership of the house, he ruled that "the testimony already shows he [Cudahy] rented the house and that his mother was responsible for the ground rent." The $26,000 paid to Cudahy in October 1946 is explained in a letter from him to the Northern Trust Company, dated October 8 of that year, wherein he stated that his doctors had advised him that "I must

seek employment as a cure for my present difficulty and that if I do not find employment reasonably soon and adjust myself to responsibility and regular hours, my present difficulties may prove fatal." He said that through his acquaintance with persons in the motion-picture industry he had acquired a "tremendous interest" in that business and wanted to find employment in some phase thereof, but that it would be impossible to obtain such employment without a financial participation in it, and since he had been offered an opportunity to participate in a production headed by one Benedict Beageus, which included suitable employment, he desired $26,000 from the principal of the trust. His request was granted after investigation by the trustee, and he received that sum in the fall of 1946. There is nothing in the record to indicate whether he gained or lost in the enterprise or whether he salvaged part of the money or securities representing the investment. Walter J. Madigan, an officer of the Northern Trust Company, who had known Cudahy for about twenty years and was familiar with the trust estate, when asked whether Cudahy had any income outside that derived from the trust up to the time of his death, said that from the statements furnished to the trustee for the purpose of preparing income-tax returns, "the only other income reported to us was his pay while in military service." His mother corroborated this evidence by her testimony that at the time of the execution of the will, he did not have any property other than that held by the trustee under the living trust. The decree so found, and appellants offered no evidence whatever either to sustain their contention or to contradict or rebut appellees' evidence.

Evidence *dehors* the will and codicil as to Cudahy's relations with the members of his family throws further light upon his intention to exercise the power, and supports the finding of the decree that his mother, his

sister Anne Cudahy Clifton and his nephew Raymond Glenn were the *primary* objects of his bounty. Cudahy was married about 1929. Two of his sisters, Mary Cudahy and Edna Leuhusen, had gone to Europe some time before 1931 and had lived there with their children almost continuously since. About two years after his marriage, Cudahy traveled abroad and saw these sisters briefly at that time. Edna and Mary, with their children, each made one trip to Los Angeles following his European trip, Edna in 1940 and Mary in 1945, and on those occasions Cudahy saw them only briefly and saw their children for the first and only time in his life. They were almost strangers to him. On the other hand, his relations with his sister Anne and his nephew Raymond were close and affectionate. Edna C. Cudahy, the testator's mother, testified that "Michael had been on friendly terms with his sister Anne and his nephew Raymond during his lifetime. Michael knew Raymond Glenn when he was a small boy and was crazy about him. When Raymond was a small boy, he referred to him as 'He is mine.' Michael always loved children; he loved Raymond. Whenever Anne was in Los Angeles, Raymond was with her and Michael and Anne visited back and forth and were on very friendly terms. They were both in a house with me, and we used to go down to the beach to his house. Anne visited with me when Michael lived with me. . . . His relation with his sister Anne and his nephew Raymond over a period of years was very close and very happy." She further stated that her son had not made provisions for his other sisters and their children because he felt their affairs were in good condition and that "they were capable of taking care of themselves and their children."

There is evidence that Cudahy used to call Anne his "pet sister"; that he felt responsible for Raymond in a way, since he felt that Raymond's father would never

be able to look out for him or leave him anything; that Raymond was the only nephew whom he had ever known and he wanted to help him. It is true, as appellants argue, that much of the foregoing testimony was given by interested witnesses, but it is significant that Edna C. Cudahy whose best financial interests would be served by a determination that the testator did not exercise his power of appointment, emphasized her son's feeling of responsibility and affection for his sister Anne and her son Raymond, and by her pleading and evidence upon trial, she took the position that the court should rule that the power of appointment was exercised because such was the intention of the testator.

██ In the *Funk* case the court quoted from *Blagge v. Miles,* that " 'All the authorities agree that it is not necessary that the intention to execute the power should appear by express terms or recitals in the instrument. It is sufficient that it should appear by words, acts or deeds demonstrating the intention.' '' That rule was followed in Illinois in later cases (*Merchants' Loan & Trust Co. v. Patterson, supra,* and *Foster v. Grey, supra*). Although there are no express terms in Cudahy's will indicating an intention to exercise the power, there is evidence of intent, as determined from the trust instrument, as well as from the will and codicil. Cudahy was not only the donor of the power of appointment but also the donee thereof; his *inter vivos* trust clearly indicates that at the time of making the trust he anticipated disposing of his trust property by a last will. The wording of the will makes it quite clear that Cudahy was attempting to dispose of everything over which he had any control. For instance, paragraph 1 of the will provides: "I do hereby revoke and terminate any and all wills, testaments, codicils and trusts heretofore made, or which may be claimed to have been made, by me"; and para-

graph 3 of the will provides: "I do hereby direct my Executor to take possession and receive any and all my property, including real property, personal property and mixed properties, and to distribute the same in accordance with the terms and provisions of this my Last Will and Testament." Moreover, it is significant that Cudahy appointed as his testamentary trustee under the will the Northern Trust Company, which was the same trustee acting under the living trust. Presumably he knew the extent of his property at the time of making his will, and since he had no property other than that held in the *inter vivos* trust, the fair inference is that he intended the testamentary trustee to continue to hold and administer the trust after the payment of debts as set forth in his will.

██ Under California law (Probate Code of California, ch. 6, par. 125) a last will and testament purporting to dispose of all the testator's property exercises any powers of appointment reserved to the testator in his lifetime which he could exercise by a last will. Although domiciled in California since his childhood, Cudahy came to Chicago to create a trust, selected an Illinois bank as trustee, provided for the physical possession and legal title to be vested in that bank, knowing it to be an Illinois institution, and when the trust agreement was ready for execution, he came to Chicago and signed it in the offices of the bank. Moreover, he specifically prescribed in section 7 of the trust instrument: "Notwithstanding that the Settlor and any or all of the beneficiaries under this Indenture of Trust may now or at any future time be domiciled elsewhere than in the State of Illinois, this Indenture of Trust shall be regarded for all purposes as an Illinois document; the validity and construction thereof shall be determined and governed in all respects by laws of the State of Illinois, and the trusts, powers, and provisions herein contained shall be administered,

616

exercised, and carried into effect according to the laws of the State of Illinois.'' Under these circumstances, we entertain some doubt as to the validity of the contention on the part of some of the appellees that California law governs and that the power was exercised by virtue of a specific statute; but in view of our conclusion that even under Illinois law the power was exercised by virtue of intent, as appears from the will alone, as well as from the will in the light of surrounding circumstances, it becomes unnecessary to determine that question.

We are of opinion that the chancellor's findings are correct, and the decree of the circuit court is therefore affirmed.

<em>Decree affirmed.</em>

SULLIVAN and SCANLAN, JJ., concur.