The Northern Trust Company, Walter J. Madigan and Marshall G. Sampsell, as Trustees Under the Last Will of Eber B. Ward, Deceased, and as Trustees Under an Indenture of Trust, Made and Executed by Yolande Elimienne Ward, Deceased, Plaintiffs-Appellees, v. Giuseppe Carlo Moscatelli, Luca Schenini, and Fred Utz, as Executor Under a Certain Document Purporting to be a Last Will of Lina Kunz Dahmer, Deceased, Unknown Legatees, Intestate Successors, Heirs or Successors in Interest of Yolande E. Ward or Eber B. Ward, Deceased, or Certain Other Deceased Person or Persons, and Unknown Owners, Defendants-Appellees.

On Appeal of Eugenie Phyllis Ward and Therese DeHeeckeren (or "DeHuekeren") D'Anthes (Also Known as Marcelle Patto), Defendants-Appellants.

Gen. No. 49,179.

First District, Third Division.

December 24, 1964.

Madigan and Thorsen, of Chicago, for Eugenie Phyllis Ward, appellant. Miller, Gorham, Wescott & Adams, of Chicago (Robert Thorsen and William P. Hodgkins, Jr., of counsel), for Therese de Heeckeren (or "De Huekeren") d'Anthes (also Known as Marcelle Patto), appellant.

Horatio Tocco and William Pellicore, of Chicago, for Giuseppe Carlo Moscatelli, appellee.

MR. PRESIDING JUSTICE SCHWARTZ delivered the opinion of the court.

This is an appeal from a decree construing the will of Yolande E. Ward in accordance with the contentions of defendant-appellee Giuseppe Carlo Mosca-

telli. Plaintiffs are trustees under both a testamentary trust created by the will of Eber B. Ward, executed in 1915, and an inter vivos trust created by his daughter Yolande E. Ward in 1932. Their complaint seeks to determine whether powers of appointment given to Yolande E. Ward in both instruments were properly exercised in her last will and testament. The sole beneficiary under Yolande's will is the defendant Giuseppe Carlo Moscatelli, son of Giovanni Moscatelli, of Como, Italy. Giuseppe Moscatelli filed a motion to strike the complaint on the ground that the will clearly and unequivocally expressed an intention to exercise the powers of appointment in his favor and that no construction or interpretation was necessary. The court denied his motion.

Answers were duly filed by Moscatelli and the other defendants and the cause was heard on the pleadings and a stipulation of facts. The trial court entered a decree finding that:

> "Considering both the will of Yolande E. Ward and the surrounding circumstances at the time her will was executed (as determined from the admissible evidence contained in the Stipulation of Facts), the court concludes that both powers of appointment were exercised by Yolande E. Ward in favor of Giuseppe Carlo Moscatelli."

An appeal from the decree was taken by Eugenie Phyllis Ward and Therese DeHeeckeren D'Anthes (also known as Marcelle Patto), the half sister and half niece, respectively, of Yolande E. Ward, who would take under the trust agreements if it were held that the powers of appointment were not exercised. The contest on this appeal is solely between them and Moscatelli.

Eber B. Ward in his will, after making provision for his daughter Yolande, provided that:

319

"In case of the death of my said daughter, Yolande, after her arrival at the age of twenty-one, whether such death shall occur prior to my death or subsequent thereto, said trustees shall dispose of the property embraced in said 'Yolande Ward Fund' according to the terms of the last will and testament of my said daughter Yolande. . . ."

The provisions of the trust created by Yolande for herself, whereby the income from the fund was paid to her for life, provided in almost the identical words of her father's will that:

"the trustee shall dispose of the properties embraced in said trust fund according to the terms of the Last Will and Testament of the Settlor, [Yolande E. Ward] . . . ."

Yolande Ward's will is very brief, the dispositive portion thereof being as follows:

"(2) For all my assets of any kind and nature I appoint and nominate as my universal heir Mr. Giuseppe Carlo Moscatelli, son of Giovanni, residing in Como, via Giuseppe Gorio No. 5.

"(3) In the event that my aforesaid heir is unable to accept this inheritance for any reason whatsoever, I appoint Mr. Giovanni Moscatelli, father of the first-named heir."

The principal issue in the instant case is whether this will is an adequate exercise of the dispositive powers contained in the respective trusts.

A stipulation of facts was entered into between the parties. From the pleadings and stipulation, the following facts appear. Yolande's father Eber B. Ward married four times and had three daughters. He also had a natural son. By his first marriage he had twin

320

daughters, Eugenie Phyllis Ward (one of the two appellants here) and Esmee Lyon Ward DeHeeckeren D'Anthes, who died in 1937, whose daughter Therese DeHeeckeren D'Anthes is the other appellant here. The first marriage ended in divorce and the mother was awarded custody of the children. The second marriage also ended in divorce, but there were no children born of that marriage. Yolande was the only child of her father's third marriage. Her mother died in 1913 when Yolande was eight years old. She was reared under the supervision of a governess whom Eber Ward married as his fourth and last wife. Yolande's welfare was the subject of a codicil which Eber added to his will in 1916. When he died in 1918, Yolande was thirteen. Her custody, discipline and control fell for a period exclusively to her stepmother. All three of Eber Ward's daughters lived abroad, Eugenie in London, Esmee in Warwick, England, and Yolande in Nice, France.

Under Eber B. Ward's will a portion of his estate, amounting to about $700,000, known as the Yolande Ward Fund, was given to three cotrustees (predecessors of the plaintiffs here) in trust, the income thereof to be paid to Yolande during her natural life. The remainder, about $1,400,000, was divided equally between her two half sisters. Provision was also made for the natural son. Eber's will further provided that if Yolande did not exercise her power to appoint, the property was to pass by the intestacy laws of Illinois. The will contained a further clause granting the trustees the discretion, after Yolande reached the age of twenty-one, to pay to her part of the principal, provided that in so doing, the amount remaining in the testamentary trust would not be less than $200,000.

In 1932, acting under the provisions of the testamentary trust, the trustees agreed to distribute to Yolande approximately $500,000 of the principal in

that trust. To receive that fund, Yolande on June 17, 1932, established an irrevocable inter vivos trust with the Northern Trust Company, Edward E. Barthell and Charles O. Rundall as trustees. These same parties were trustees under the testamentary trust. Rundall was a lawyer who also acted as personal attorney for Yolande and as counsel for the trusts.

■ In 1926 Yolande had established an agency account with The Northern Trust Company, which was closed out in 1949. At the time she drew her will in December 1942 there was about $216,000 in that account. Generally speaking, an agency account is one in which securities are deposited with a bank without transfer of title, but with such authority as the principal may delegate to receive dividends, clip and present interest coupons for payment, and deposit the same to the credit of the principal, and for such other duties as may be covered in the agency agreement.

Yolande married one Luca Schenini in Italy in 1936, but in April 1941 she wrote Rundall that she had begun separation proceedings; that Rundall should not send any more money to her husband; and that all correspondence with her should be directed to her in care of Signor Mario Valenti, her Italian counsel. She also asked that a copy of her father's will be sent her and that Rundall advise her "what the estate is that belongs to me which you administrate." Rundall replied on May 9, 1941, telling her about the testamentary trust of her father, the inter vivos trust which she had established in 1932 pursuant to her father's will, and about the agency account, and enclosed the documents she requested. A complete statement of the assets in the three funds being administered by The Northern Trust Company accompanied his letter and he added some comments as to the quality of some of the investments and holdings.

On June 16, 1941, Rundall wrote to Yolande, replying to a cablegram requesting funds, telling her that the transfer of funds was prohibited at that time by executive order of the President because of the European war, saying:

> "You must bear in mind that under the conditions of the trusts which control your funds it is provided that in case of your death the trust assets will go directly to those persons named in your will, and in the absence of such a will to those determined in accordance with the law of intestate succession of the State of Illinois.
>
> "This means that if you should die in your present condition, Mr. Schenini will inherit all of your personal property and one-half of your realty, and I presume you do not want this to happen. Therefore, it is important that you consider with Sig. Valenti the advisability of making a will.
>
> "But in so doing you cannot deprive Mr. Schenini of a substantial part of your estate so long as the marital relationship continues."

There is also in evidence a letter of September 25, 1945, from Rundall to Yolande, telling of his efforts to communicate with her through the International Red Cross, the State Department of Switzerland, and the foreign office of the Vatican in Rome "realizing that you must be suffering hardship because of the war and our inability to make remittances of money to you."

Yolande divorced her husband and died without issue on July 1, 1959. In addition to her will dated December 17, 1942, she left two holographic wills, one dated September 23, 1941, and left with her counsel Valenti, and the other dated the same day as her will, December 17, 1942, and found among her per-

sonal effects in Como. The first holographic will (dated September 23, 1941) reads as follows:

"Being in the most complete possession of all my faculties, both physical and mental, and wishing to dispose of my substance upon my death, I direct that all of my substance whether found in Italy or in America, shall pass as the absolute property of Sig. Giuseppe Moscatelli of Como, as my sole universal heir.

"I name as my testamentary executor the Sig. Avv. Comm. Mario Valenti of Milano.

"I swear that this is my personal spontaneous will."

The second holographic will (dated December 17, 1942) reads as follows:

"(1) I revoke all testaments and codicils previously made by me.

"(2) I give and bequeath in this testament as the universal heir of all my property, personal or mixed, wherever situated, to Giuseppe Carlo Moscatelli, son of Giovanni of Como, and to his heirs and assigns.

"(3) I wish to be buried in Como as soon as my death has been established and that the funeral be conducted according to Christian rite. Such are my last wishes, executed and written entirely in my own hand, in sound mind at Milan the 17th day of December, 1942."

At the time Yolande executed the will here in question her nearest blood relatives were the defendants-appellants, her half sister and half niece. When Yolande's father and his first wife were divorced, the custody of their two children went to their mother, who took them to England to live. There was a disparity of sixteen years between the twins, Eugenie

and Esmee, and Yolande. Notices mailed in connection with the presentation of the final account in Eber Ward's estate in 1919 were sent to Eugenie in care of Claridge's Hotel, London; to Esmee in care of Lloyd's Bank in Warwick, England; and to Yolande at Villa Jeanne, Parc Imperial, Nice, France. There appears to be nothing in the stipulation of facts or other documents which reveals the later addresses of Eugenie, Esmee or Esmee's daughter Therese.

The principal contention made by the defendants-appellants is that "a general residuary clause," no matter how broad in scope, cannot constitute the exercise of a power of appointment, "General residuary clause" is a misnomer. What is meant by this designation is the entire dispositive portion of Yolande's will which provides that for all of her assets she appoints and nominates Moscatelli as her universal heir. Defendants-appellants cite two cases under this point —Funk v. Eggleston, 92 Ill 515 (1879) and Emery v. Emery, 325 Ill 212, 156 NE 364. Funk v. Eggleston does not in our opinion support their position. In that case the court discussed the old English rule that a power of appointment would be considered as exercised only if (1) there was a specific reference to the power in the will; or (2) a specific reference in the will to the property covered by the power; or (3) by a showing that the will would be inoperative without the exercise of the power. It said, at p 546:

> "The demands of substantial justice do not require we should follow the subtle niceties of some English cases; and such course would be inconsistent with the liberal rules we have heretofore announced should govern in the ascertainment of the intentions of testators."

The court cited Blagge v. Miles, 1 Story 427, in which Justice Story said:

> "Intention, however manifested, whether directly or indirectly, positively or by just implication, will make the execution valid and operative." (p 538)

This was a salutary development. "[P]rogress," says Wigmore, "has been from a strict *formalism* to a liberal and flexible practicality. The mark of primitive legal standards, throughout all, is formalism. . . ." 9 Wigmore on Evidence § 2405, at p 10 (3rd Ed, 1940).

In Northern Trust Co. v. Cudahy, 339 Ill App 603, 91 NE2d 607, the court, after analyzing Funk v. Eggleston, said, at p 610:

> "The rule in Illinois is clear; intention, however manifested, will make the execution of a power valid and operative, and in ascertaining intention the words of the will are to be read in the light of circumstances under which it was executed; and while parol evidence is not properly admitted to show what the testator intended to write, it may be admitted where its effect is merely to explain or to make certain what the testator has written."

In Rettig v. Zander, 364 Ill 112, 4 NE2d 30, the court affirmed the rule laid down in Funk v. Eggleston, supra. ██ Emery v. Emery, supra, relied upon by defendants-appellants in support of their contention, is distinguished both in Northern Trust Co. v. Cudahy, supra, and in Rettig v. Zander, supra. The court in the latter case said, at p 119:

> "We pointed out in that case [Emery v. Emery] that there were no surrounding circumstances. The only evidence offered was the two wills, so that the situation there was entirely dif-

ferent from the case before us and from that in Funk v. Eggleston, supra."

It thus appears clear that under Illinois law the intention of the testator supersedes the formal requirements with respect to the exercise of a power of appointment, and that extrinsic evidence may be introduced to show that intention. Funk v. Eggleston, supra; Rettig v. Zander, supra; Northern Trust Co. v. Cudahy, supra. The primary object in the instant case is therefore to discover the testator's intention.

The dispositive portion of Yolande's will provides that for all her "assets of any kind and nature," she appoints and nominates as her "universal heir, Giuseppe Carlo Moscatelli." The phrases are significant—"assets of any kind and nature," and "universal heir." "Assets" is a simple word and we know its connotation in daily life. Webster's International Dictionary, 2nd Ed, Unabridged, defines asset as follows:

> "*Law* . . . a. Originally in the Anglo-French phrase, *aver assets,* to have enough (viz, to discharge one's obligations); hence, property of a deceased person which in the hands of his heir or executor, is sufficient to pay his debts and legacies; hence, property of a deceased person subject by law to the payment of his debts and legacies."

If any one had inquired of Yolande whether she considered the sources from which she derived her income as "assets," her response certainly would have been in the affirmative. "Universal" is defined as follows:

> "Having relation to the whole or an entirety; pertaining to all without exception; a term more

extensive than 'general,' which latter may admit of exceptions." Black's Law Dictionary.

Following the correspondence with her lawyer in Chicago, Yolande on September 23, 1941, drew the holographic will, which we have hereinbefore quoted, and directed that "all of my substance whether found in Italy or in America, shall pass as the absolute property of Sig. . . . Moscatelli . . . as my sole universal heir." In the second holographic will executed by her on December 17, 1942, some minor changes seem to have been made in the dispositive portion, but evidently its chief purpose was to express a burial wish, and she reiterated her desire that Moscatelli should have all her property.

In addition to this impressive evidence supporting the decree of the trial court, there are the general circumstances surrounding execution of the will. It is a fair conclusion, from the complicated structure of Eber Ward's family, that Yolande was never close to her half sisters or half niece. The twin sisters were sixteen years older than she was and were the children of her father's first marriage, while she was the child of his third marriage. At the time of their father's death the twins lived in England. Yolande lived in Italy, where she married, was divorced and lived until her death. There seems to have been little or no contact and no bond of affection between Yolande and the other members of her father's family. If there was any basis for the conclusion that the half sisters or half-sister and half niece might be the natural objects of her bounty, the latter could have presented the best evidence in that respect, and lacking such evidence, it is fair to assume that the relationship between Yolande and the defendants-appellants was not such as to make them the natural objects of her bounty. Obviously she did not so regard

them when she made her two holographic wills and the will now before us, nor did she include them as beneficiaries, contingent or otherwise, in the 1932 inter vivos trust.

It is contended that Yolande's will could operate to dispose of her assets in Italy and of such property as she had in the agency account, even though it might not operate to pass the trust property over which she had the power of appointment. Yolande made no distinction, however, between the property in trust and that not in trust. In her letter to Rundall (her attorney and trustee in Chicago) of April 2, 1941, she asked "let me know what the *estate* is that belongs to me which you administrate." (Emphasis added.) She regarded the trusts and the agency account as part of her estate, and in referring to them, she treated them as a unit.

Before World War II Yolande received from Rundall a copy of her father's will and a statement of the nature of the three funds she had with The Northern Trust Company. On June 16, 1941, in reply to a cablegram from her requesting funds, Rundall replied, stressing the importance of making a will and adding "in case of your death the trust *assets* will go directly to those persons named in your will." (Emphasis added.) He did not tell her to refer to the powers or to mention the trusts in the instrument she was to execute. Even Rundall, her counsellor and trustee, did not have in mind the technical requirements of the old English law with respect to the exercise of powers of appointment.

Both the testamentary and the inter vivos trust have clauses providing that "in default of such last will and testament, then said trustees shall pay out the property embraced in said trust fund to [the intestate successors of Yolande Ward]." It would appear that the creators of those instruments desired

329

to say specifically that the corpus of the trusts should pass as intestate property only if Yolande failed to leave a will designating her heirs.

All the property which Yolande owned in the United States in 1941 and 1942 and up until the time of her death was being administered by trustees under the inter vivos and testamentary trusts, except for an agency account which had been established by her with The Northern Trust Company acting alone and which was closed out in 1949. Yolande lived on the income of those trusts and on funds derived from the principal of the trusts and the agency account. There can be little doubt that "assets" to her meant all the property in both the inter vivos and testamentary trusts and that she was disposing of these by her last will.

It is argued that it was error to admit in evidence Exhibits 4–8, being a portion of the correspondence between Yolande Ward and Charles Rundall and between Rundall and Yolande's counsel in Italy, Sig. Valenti. Defendants-appellants argue that although a stipulation of facts was entered into which included that correspondence, the right to object to the admissibility in evidence of any of the statements of fact contained therein was reserved and that there was no stipulation that the original letters were in fact written, that the carbon copies were true and correct copies of the original letters, or that the original letters were in fact sent and received. Defendants-appellants argue that the stipulation was limited to the fact that carbon copies or translations of those letters were found in Yolande's home after her death or in the files of The Northern Trust Company, and that the purpose of the stipulation was to eliminate the necessity of bringing in witnesses to testify through an interpreter as to the facts surrounding the finding of the carbon copies of purported letters.

Defendants-appellants point to the fact that the word "purported" was placed, on their insistence, before every mention in the stipulation of facts of the objectionable letters.

The stipulation of facts, dated August 1, 1962, reads:

> "It is hereby stipulated and agreed by and between the parties hereto acting through their respective counsel that the following statements of fact are true, without prejudice to the right of any of the parties hereto to object to the admissibility in evidence of any of said statements of fact:"

Accompanying the stipulation was the affidavit of Horatio Tocco, one of the attorneys for Moscatelli. It listed and described all the documents referred to in the stipulation, told where they came from, and how they appeared before the court. It concluded as follows:

> "Affiant makes this affidavit for the purpose of inducing all of the parties to said stipulation to accept the genuineness of said Exhibits 1 to 10, both inclusive, *in lieu of the originals thereof.*" (Emphasis added.)

■ It is our conclusion that the genuineness of the documents was conceded by the stipulation and that the objection as to admissibility was predicated on the assumption that the exhibits themselves were genuine and valid, and that it questioned only their competency or materiality to prove intent. The use of the word "purported" in the stipulation is not sufficient to overcome the plain meaning of the opening paragraph of the stipulation and of Tocco's affidavit. To adopt the defendants-appellants' construction of the stipulation would render it (the stipulation) al-

most meaningless and would reopen for controversy many questions which a stipulation of facts normally is intended to cover.

■ Defendants-appellants next argue that the exhibits in question violate the statute of wills and contain hearsay evidence. The first contention is without merit because it is not sought to vary or change the terms of the will, but is merely an effort to show what was meant by what was said. Northern Trust Co. v. Cudahy, 339 Ill App 603, 91 NE2d 607, 610.

On the question of hearsay, it is necessary to differentiate between the letters Rundall wrote to Yolande and those she wrote to him, and also the letters which Rundall wrote to Valenti, counsel in Italy for Yolande, and which Valenti wrote to Rundall. Rundall wrote three letters to Yolande. Exhibit 5 refers to Yolande's letter of April 2, 1941, to him and encloses information concerning the nature of the two trusts and the agency account and the value of the assets they contained, and assures her of his desire to answer any questions she might have relating to her affairs in Chicago. Exhibit 6 is a letter from Rundall to Yolande, dated June 16, 1941, in which he said that in the absence of her will, the trust assets would pass according to the laws of intestate succession in Illinois; that if she died without a will, a portion of her property would pass to her husband Schenini, which in view of her marital situation, she would not desire; and that to deprive Schenini of all rights in her property, the marital relationship had to be terminated. Exhibit 9 is a letter written by Rundall to Yolande in September 1945 after Yolande had made a will and refers to his "many efforts to get in touch with you [Yolande] during the last four years," and is not objected to on the ground of hearsay.

■ The definition of "hearsay" as developed in recent Illinois cases is that it is an out-of-court state-

ment offered for the truth of the matter asserted. People v. Carpenter, 28 Ill2d 116, 190 NE2d 738; People v. DeMarco, 44 Ill App2d 459, 195 NE2d 213.

■ The letters from Rundall to Yolande were not offered for the truth of the matters asserted, but to show that Yolande had notice of the information contained therein. Since our primary object is to discover Yolande's intention when she made the will and whether she intended it to be an exercise of the power of appointment, it is relevant to show that she was informed as to the nature of the trust instruments and of the assets in the trusts and the types of holdings, that she knew that the assets in the trusts would pass by the intestacy laws of Illinois if she failed to make a will, and that to eliminate Schenini, her husband, from her will, it was necessary for her to terminate their marital relationship. As such, the letters can be admitted, not for the truth of the statements contained therein, but to show that Yolande understood these to be the facts, whether true or not. Whether these facts were actually in her mind at the time she made the will in question goes only to their weight as evidence, and not to their admissibility.

Exhibit 4, the letter from Yolande to Charles Rundall, written in April 1941, is admissible under the state of mind exception to the hearsay rule. In that letter she wrote to him about her marital problems, asked that a copy of her father's will be sent to her, and that Rundall advise her "what the estate is that belongs to me which you administrate."

■ ■ The classic definition of the state of mind exception is contained in 6 Wigmore on Evidence, § 1725, at p 80 (3rd Ed, 1940):

> "The existence of a design or plan to do a specific act is relevant to show that the act was probably done as planned. The design or plan,

being thus in its turn a fact to be proved, may be evidenced circumstantially by the person's conduct. . . . But, as a condition of mind, the plan or design may also, it is clear, be evidenced under the present Exception [to the hearsay rule], by the person's own statements as to its existence.

"The only limitations as to the use of such statements (assuming the fact of the design to be relevant) are those suggested by the general principle of this Exception [to the hearsay rule], namely the statements must appear to have been made in a natural manner and not under circumstances of suspicion."

Wigmore then quotes Justice Gray in Mutual Life Ins. Co. v. Hillmon, 145 US 285. The whereabouts of the alleged deceased was in issue. Letters of his were offered expressing an intention to leave Wichita for Colorado:

"Letters from him to his family and to his betrothed were the natural, if not the only attainable evidence of his intention. . . . A man's state of mind or feeling can only be manifested to others by countenance, attitude, or gesture, or by sounds or words, spoken or written. . . . The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact as his own testimony that he then had that intention would be. After his death, there can hardly be any other way of proving it; and while he is still alive, his own memory of his state of mind at a former time is no more likely to be clear and true than a bystander's recollection of what he then said, and is less trustworthy than letters

written by him at the very time and under circumstances precluding a suspicion or misrepresentation."

Illinois courts have recognized this exception to the hearsay rule. In Wilkinson v. Service, 249 Ill 146, 94 NE 50, statements by the testator indicating a belief that his daughter lacked affection for him were admitted. The court said:

"The rule is well established in this State that the declarations of the testator are competent, in a contest involving the validity of his will, to show the state of his mind but not to prove the facts stated. (Citations.) Whatever is material to prove the state of a person's mind or what is passing in it, and what were his intentions, may be shown by his declarations and statements. The truth or falsity of such statements is of no consequence. They are to be used only as showing the condition of his mind. Declarations, prior to the execution of the will, that certain of the testator's children were wanting in natural affection are properly considered as showing his state of mind. (Citations, including 3 Wigmore on Evidence, § 1734.)"

Illinois courts have held that even hearsay statements of a testator about past events may be admitted. Boyle v. Boyle, 158 Ill 228, 42 NE 140 (fact of destruction of will was established by declarations of the testator that he had destroyed the will); Burton v. Wylde, 261 Ill 397, 103 NE 976 (declarations of testator were admissible to show whether she had intended to revoke the will by mutilation); Cantway v. Cantway, 315 Ill 244, 146 NE 148 (subsequent declarations of testator admissible to prove contents of destroyed will where corroborated by another witness). Yolande Ward's letter comes within this analysis.

335

The statements were made in a natural manner and not under circumstances of suspicion. It was properly admitted.

From the state of mind of Yolande as thus determined, the chancellor could well have concluded that she intended to exercise the powers of appointment contained in the two trusts as to all the property, not simply the agency account and the property Yolande had in Italy.

■ ■ As to Exhibits 7 and 8, which constitute the correspondence between Rundall and Valenti, Yolande's Italian counsel, written after Yolande's initial contact with Rundall and before she wrote her will, we see no rational basis on which this evidence could be admitted as an exception to the hearsay rule. Moscatelli argues that all the correspondence is admissible under the state of mind exception, but it is obvious that the state of mind of Rundall or Valenti is irrelevant to a consideration of whether Yolande intended to exercise the powers of appointment. If we were to consider the contents of those two letters, it would clearly be for the purpose of considering the truth of the matters asserted in the letters, and that we are not permitted to do. We do not, however, consider the admission of these letters in evidence to be reversible error in view of the other overwhelming evidence establishing that Yolande intended by her will to exercise her powers of appointment.

■ In the trial of issues of fact there are occasions on which the *lack* of evidence, as well as the evidence presented, should be given consideration. The last time the record reveals anything concerning the defendants-appellants, before they appeared to claim Yolande's estate, is in 1919, in connection with the presentation of the final account in Eber Ward's estate, when notices were sent to Eugenie in London

336

and to Esmee in Warwick, England. Nothing in the agreed statement of facts or in the other documents throws any light on whether there was any communication between them and Yolande, and yet they and perhaps only they, could have enlightened the court on the nature of their relations with Yolande Ward. There is little doubt that Yolande, childless, unhappy in her marital relationship and seeking a divorce, and having no contact with her relatives, intended by her will to exercise her powers of appointment in favor of Moscatelli and that her whole estate, including her interest in the trusts, should pass to him.

The chancellor properly so found and his decree is affirmed.

Decree affirmed.

DEMPSEY and SULLIVAN, JJ., concur.